**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **RICHARD DONALDSON,**<br>805 Walnut Grove Road<br>Essex, MD 21211<br><br>**WALTER** and **DAWN SPERL**,<br>1906 Atkisson Road<br>Joppa, MD 21085<br><br>*Plaintiffs*,<br><br>v.<br><br>**PRIMARY RESIDENTIAL<br>MORTGAGE, INC.**<br>1480 North 2200 West<br>Salt Lake City, UT 84116<br><br>    <u>Serve on:</u><br>    The Corporation Trust, Inc.<br>    2405 York Road, Suite 201<br>    Lutherville Timonium MD 21093-2264<br><br>*Defendant*. | Civil Action No.: |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs Richard Donaldson and Walter and Dawn Sperl on behalf of themselves and the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

### INTRODUCTION

1.      Plaintiffs Richard Donaldson ("Donaldson"), Walter and Dawn Sperl (collectively, the "Sperls"), and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant Primary Residential Mortgage Inc. ("Primary Residential") which was or is secured by residential real property.

2.      Donaldson, the Sperls, and alleged Class Members are victims of an illegal kickback and price fixing scheme between Primary Residential and All Star Title, Inc. ("All Star"), a Maryland title and settlement services company.

3.      Under the scheme, Primary Residential by and through its branch managers, loan officers, agents and/or other employees received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*  Primary Residential and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.      As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). Primary Residential participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§1, *et seq.*, entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to Primary Residential.

5.    Primary Residential benefitted from the Cartel Agreements because the supracompetitive charges for title and settlement services charged Primary Residential borrowers under the Cartel Agreements were financed into the borrower's loans and insured the continued funding of illegal kickback payments.

6.    Primary Residential and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the All Star Scheme willfully and intentionally engaging in a pattern of racketeering activity over a period of at least five years in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961*, et. seq.*

7.    The All Star Scheme, racketeering activity, and Kickback and Cartel Agreements, along with the resulting illegal kickbacks and supracompetitive prices, were fraudulently concealed by Primary Residential and All Star from Donaldson, the Sperls, and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with Primary Residential loans, and false and fraudulent representations and omissions in Primary Residential borrowers' loan documents.    These fraudulent concealments prevented borrowers, regulators and auditors from discovering the All Star Scheme, racketeering activity, or Kickback and Cartel Agreements, or the injuries to Primary Residential borrowers therefrom, and allowed the kickbacks and supracompetitive fees to continue.

## PARTIES

8.    Plaintiffs bring this action pursuant to Fed. R. of Civ. Pro. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.    Plaintiff Richard Donaldson is a citizen and resident of Baltimore County, Maryland.

10.    Plaintiffs Walter and Dawn Sperl are a married couple and citizens and residents of Harford County, Maryland.

11.    Defendant, Primary Residential Mortgage Inc. is a corporation organized under the laws of Utah.  Primary Residential is now, and has been at all times relevant to the claims pled herein, qualified and registered to transact business in Maryland, and has continuously transacted business in this District and Maryland, specifically engaging in residential mortgage lending related to properties located in the District and Maryland, as well as other banking and lending transactions.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 4 of the Sherman Act, 15 U.S.C. § 4.

13.    This Court has personal jurisdiction over the parties. Personal jurisdiction over Primary Residential is appropriate because during the time period alleged herein Primary Residential was qualified to, registered to and transacting business within this District and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the conduct, events and omissions giving rise to Plaintiffs and Class Members' claims occurred within this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

15.     At all relevant times, All Star Title Inc. ("All Star") was a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration.  All Star was a licensed title and settlement service provider in more than 30 states, and provided title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

### I.  The All Star Scheme

16.     Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") with lenders and their mortgage brokers, loan officers and other employees (collectively, "Participating Lender") to charge borrowers higher prices for title and settlement services and defraud borrowers of their money through the use of U.S. Mail and wires.

> **i.     All Star pays kickbacks in exchange for Participating Lenders' assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services.**

17.     Beginning by at least 2008, All Star agrees to pay kickbacks to various residential mortgage lenders, and their brokers, loan officers and other employees and/or agents (collectively, "Participating Lenders") in exchange for the Participating Lenders' assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

18.     All Star bases the amount of the kickback on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

19.     All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and by and through different channels.

20.     In some instances, All Star chooses to pay the kickback by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

21.     In other instances, All Star chooses to pay cash kickbacks by checks written directly to a Participating Lender and/or their mortgage brokers, loan officers or other employee. Often, a Participating Lender, or its employee, receives and accepts a kickback check by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

22.     In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender but instead agrees with the Participating Lender to launder the kickback payment through a third party marketing company.   The Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender uses for marketing services (such as a direct mail, borrower leads data or marketing lists, or telemarketing provider).   All Star then makes the kickback payment to the third party marketing company and the Participating Lender receives and accepts the kickback payment when the third party marketing company applies the payment to an invoice for marketing services for the benefit of the Participating Lender.

23.     All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks, including such companies as Best Rate Referral, Influence Direct, and Camber Marketing Group. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for

direct mail or telemarketing solicitations. Still other third party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

24. To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing company to issue sham invoices falsely stating the payment is being made by All Star for the purpose of purchasing marketing services from the third party marketing company. These sham invoices create the false impression that All Star is purchasing marketing services when in fact All Star is not purchasing marketing services, and the payment is a kickback the Participating Lender is receiving and accepting in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

25. The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans the Participating Lender assigns and refers to All Star under the Kickback Agreement.

26. In some instances, All Star and Participating Lenders request and cause the third party marketing company to issue sham split invoices in which the All Star is issued one invoice and the Participating Lender is issued a second invoice.

27. All Star and the Participating Lenders choose to use these sham split invoices to create the false impression that All Star is purchasing marketing services when in fact that payment is a kickback the Participating Lender is receiving and accepting in exchange for the assignment and referral of loans to All Star under the Kickback Agreement. The sham split invoices also conceal All Star and the Participating Lender's coordinated

business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

28.    In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice.  Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launders a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

29.    The choice to use sham payment records to conceal the fact that All Star made a payment to the third party marketing company at all and create the false record that the payment provided to the third party marketing company came from the Participating Lender, is an integral part of the All Star Scheme and Kickback Agreement and to conceal the fact that the payment originates with All Star.  The sham payment records and laundering the payoffs through marketing companies also conceal the fact that All Star and the Participating Lender exchanged a thing of value related to the loans assigned and referred to All Star under the Kickback Agreement.

ii.    **All Star and Participating Lenders form the All Star Lender Cartel, conspire and agree to fix prices for title and settlement services, and refuse to deal with All Star competitors.**

30.    One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement services than is possible in a competitive market, and to exclude other title and settlement service companies from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

31.   To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

32.   To enforce the All Star Lender Cartel, All Star and Participating Lenders conspire and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

33.   In addition, All Star and the Participating Lenders conspire and agree to minimum prices to charge borrowers for title and settlement services on loans assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

34.   The Price Fixing and Minimum Fee Agreements are enforced by agreement that the Participating Lender will refuse to deal with any other title and settlement services company on those loans generated by the All Star-funded kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that all loans generated by the Kickback Agreement are assigned and referred to All Star and subject to the Price Fixing and Minimum Fee Agreements.

35.   The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would have been charged for title and settlement services without the Cartel Agreements and in a competitive market.

36.   An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances

and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks.

37.     Participating Lenders benefit from the Cartel Agreements because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees were financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earns interest and other fees on the supracompetitive pricing.

### iii.     All Star and the Participating Lenders use the U. S. Mail and interstate wires to identify and lure borrowers into the All Star Scheme.

38.     All Star and Participating Lenders intend the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

39.     In service of this intention, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

40.     Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower leads data and marketing "leads lists."

41.     Participating Lenders use these data and lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material, that encourage

borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

42.    All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

43.    Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mails.

44.    All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone and internet, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers. Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include, and do in fact include, in direct mail solicitations.

45.    Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating

Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

46.    All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

47.    All Star and Participating Lenders also administer the Kickback and Cartel Agreements over interstate wires negotiating, agreeing to and enforcing the fixed prices and refusal to deal by and through communications over interstate wires.

48.    All Star and Participating Lenders also choose to use interstate mails and wires to transmit and receive and accept illegal kickback payments and the sham invoices and payment records that conceal the kickback payments, and the Kickback and Cartel Agreements.

**II. Primary Residential Participates in the All Star Scheme Beginning in 2009.**

49.    By at least October, 2009, Primary Residential, by and through its branch managers, loan officers and other employees, agrees to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Primary Residential brokered loans to All Star for title and settlement services.

50.    All Star pays, and Primary Residential receives and accepts, kickbacks by and through third party marketing companies being used by Primary Residential for marketing services.

51.    At all relevant times, the Primary Residential branch managers and loan officers participating in the All Star Scheme were licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within scope of the business

relationship and duties of their employment on behalf of Primary Residential, specifically seeking borrowers and originating and securing loans for residential mortgages through Primary Residential and/or brokering such loans through Primary Residential to other lenders with whom Primary Residential authorized, referring Primary Residential Borrowers to title companies, and working with title companies to close these loans. All activities, including any interaction with All Star, were for the benefit of Primary Residential.

     **i.**      **Primary Residential's Participation in the All Star Scheme begins with loans from the Primary Residential Baltimore Branch**

52.    Primary Residential begins participation in the All Star Scheme by, at least, October, 2009. Primary Residential agrees to receive and accept kickbacks paid by All Star in exchange for the referral of Primary Residential loans from the Primary Residential branch located at 2914 E. Joppa Road, Suite 202, Baltimore, Maryland ("Primary Residential Baltimore Branch").

53.    On or about October 13, 2009, All Star pays a $4,230 kickback to Primary Residential laundered by and through Best Rate Referrals, a Nevada based data and lead list provider ("Best Rate Referral"). The sham invoice and payment records associated with the kickback appear as Exhibit 1(a) – (b). The invoice refers to Doug Adkins who is a loan officer employed by Primary Residential in the Primary Residential Baltimore Branch.

54.    The sham invoice states that Best Rate Referral designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Based on the postage charges included in the description section of the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if

not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Nevada – and delivered to a borrower in a different state.

55. In addition, All Star transmits the kickback payment over interstate wires with the kickback payment originating from All Star's bank in Maryland and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada.

56. Just a week later, All Star pays a $2,950 kickback to Primary Residential laundered by and through Direct Marketing Associates Services, Inc. ("DMA Services"), a Florida based mortgage marketing company. The sham invoice and email memorializing the kickback payment appear as Exhibit 2(a)-(b).

57. The sham invoice states that DMA Services designed, produced and mailed Primary Residential borrower solicitations to potential borrowers.  Based on the postage charges included in the description section of the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Florida – and delivered to a borrower in a different state.

58. In addition, All Star transmits the kickback payment over interstate wires in the form of a credit card authorization originating from All Star's offices in Maryland and Primary Residential receiving and accepting the kickback by and through DMA Services in Florida.

59. The next week, on or around October, 27, 2009, All Star and Primary Residential conspire and agree to fix prices for title and settlement services associated with Primary Residential loans referred to All Star in furtherance of the Kickback Agreement setting

the prices charged at a "flat $1300 that will include everything" on "streamlines".  Ex. 3, 10/27/2009 Email.

60.    Primary Residential in fact refers Primary Residential loans to All Star for title and settlement services in performance of the Kickback Agreement.  Ex. 4, 11/9/2009 Email. Exhibit 4 refers to Derek Adkins, a loan officer employed by Primary Residential in the Primary Residential Baltimore Branch and a relative of Doug Adkins.

61.    Primary Residential continues to assign and refer loans to All Star from the Primary Residential Baltimore Branch in and through March, 2010, when the Primary Residential Baltimore Branch closes.  In the meantime, All Star and Primary Residential pitch the kickback plan to other Primary Residential branches. Ex. 5, 10/25/2010 Email.

   **ii.    Primary Residential's Expands its Participation in the All Star Scheme to Branches in Utah and Arizona.**

62.    On or about May 24, 2011, All Star pays a $1,344 kickback to Primary Residential laundered by and through Best Rate Referral. The sham split invoices and record of All Star's wire transfer associated with this kickback appear as Exhibit 6 (a) - (c).  The Best Rate Referral Invoice refers to Robert Timpson, the branch manager and loan officer employed by Primary Residential in a Primary Residential branch located at 1185 W. Utah Ave, Hildale Utah ("Primary Residential Hildale Branch").

63.    The sham invoices state that Best Rate Referral designed, produced and mailed Primary Residential borrower solicitations to potential borrowers.  Based on the materials described on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Nevada – and delivered to a borrower in a different state.

64.   In addition, All Star transmits the kickback payment over interstate wires originating from All Star's bank in Maryland and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada.

65.   The explicit purpose of All Star's kickback to Primary Residential was to "get at least 15 deals" assigned and referred from Primary Residential to All Star, and for All Star to "eventually pay for half of your loan drops," referring to the borrower direct mail sent by Primary Residential's Hildale Branch. Ex. 6(c); Ex. 7, 5/24/2011 Email.

66.   Primary Residential in fact assigns and refers Primary Residential loans to All Star in performance of the Kickback and Cartel Agreements.  Ex. 8, 7/18/2011 Email.

67.   Roughly three weeks later, on or about June 17, 2011, All Star pays a $4,820.44 kickback to Primary Residential laundered by and through Best Rate Referral.  The sham invoice associated with the kickback appears as Exhibit 9.

68.   The Best Rate Referral Invoice refers to Joyce Steed, the branch manager and loan officer employed by Primary Residential in a Primary Residential branch located in Centennial Park, Arizona ("Primary Residential Arizona Branch").  Steed's NMLS listing states she is also a member of Primary Residential's Board of Directors.

69.   All Star transmits the kickback payment over interstate wires with the kickback payment originating from All Star's bank in Maryland and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada.

70.   Shortly before it pays Primary Residential the kickback, All Star makes clear that the purpose of the  kickback payment is for a " 'unit goal' on the mail drop" that "can be met" by Primary Residential "closings from the mail, or any other source. It doesn't matter where its from just as long as we hit that unit number." Ex. 10, 6/22/2011 Email.

71.    All Star and Primary Residential agree the "unit goal" associated with June 17, 2011 kickback payment is 35 Primary Residential loans assigned and referred to All Star from the Primary Residential Arizona Branch. Ex. 11, 6/6/2011 Email.

72.    Also shortly before All Star pays the June 17, 2011 kickback, All Star and Primary Residential conspire and agree to fix prices at $1250 for title and settlement services on loans assigned and referred to All Star by Primary Residential in furtherance of the Kickback Agreement.   Ex. 10; Ex. 12, 7/14/2011 Email.   All Star and Primary Residential identify that the fixed price includes a "marketing fee" of $160.70 ("Marketing Surcharge").  This Marketing Surcharge represents the minimum amount of actual damages caused Primary Residential borrowers from All Star and Primary Residential's performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential conduct in furtherance of the All Star Scheme.

73.    The $1250 fixed price Primary Residential and All Star agree to is $250 higher than the price other title companies were charging Primary Residential borrowers for the same title and settlement services ("Settlement Fee Overcharge").  Ex. 13, 7/26/2011 Email. This Settlement Fee Overcharge is, with the Marketing Surcharge, the minimum amount of actual damages caused Primary Residential borrowers from All Star and Primary Residential's performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential conduct in furtherance of the All Star Scheme.

74.    The $1250 fixed price was negotiated in part by Paul Knudson, a branch manager employed by Primary Residential in the Primary Residential Arizona Branch. Ex. 10.

75.  A little more than a week later, on June 23, 2011, All Star pays a $1325 kickback to Primary Residential laundered by and through Best Rate Referral. The sham invoice and payment record associated with this kickback appear as Exhibit 14(a)-(b).

76.  The sham invoice states that Best Rate Referral designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 14(a). Based on the materials described on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Nevada – and delivered to a borrower in a different state.

77.  In addition, All Star transmits the kickback payment over interstate wires with the payment originating from All Star's bank in Maryland and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada.

78.  Just a few days later, on June 28, 2011, All Star pays another $1364.75 kickback to Primary Residential laundered by and through Best Rate Referral. The sham invoice, payment record and email associated with this kickback appear as Exhibit 15(a)-(c).

79.  The sham invoice states that Best Rate Referral designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 15(a).  Based on the materials described on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Nevada – and delivered to a borrower in a different state.

80.  In addition, All Star transmits the kickback payment over interstate wires by credit card authorization communicated over email originating from All Star's offices in Maryland

and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada.  Ex. 15(b).

81. Primary Residential in fact assigns and refers Primary Residential loans to All Star in performance of the Kickback and Cartel Agreements.  Primary Residential promises "we are dropping our new mailer today, all the title orders will be opened with All-star on this new order."  Ex. 15(c), 7/7/2011 Email.

82. The same day All Star pays another $1,364.75 kickback to Primary Residential laundered by and through Best Rate Referral. The sham invoice and email related to payment associated with this kickback appear as Exhibit 16(a)-(b).

83. The sham invoice states that Best Rate Referral designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 16(a).  Based on the materials described on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Nevada – and delivered to a borrower in a different state.

84. Based on All Star's continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star transmits the kickback payment over interstate wires by credit card authorization communicated by email originating from All Star's offices in Maryland and Primary Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada. Ex. 16(b).

85. Roughly a month later, on August 8, 2011, All Star pays an $876 kickback to Primary Residential brokered by and through Best Rate Referrals.  The sham invoice and emails regarding payment associated with this kickback appear as Exhibit 17(a)-(b).

86.     According to the sham invoice, Primary Residential is receiving "Live Transfer" calls from Best Rate Referrals. Ex. 17 (a). Plaintiffs believe, and therefore aver, that the call center Best Rate Referrals uses to source these "live transfer" calls is not in Utah such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state, and being transferred to a Primary Residential loan officer or branch in a different state.

87.     At the end of August, All Star pays a $744.69 kickback to Primary Residential laundered by and through Best Rate Referrals.  The sham invoice associated with the kickback appears as Exhibit 18.

88.     All Star and Primary Residential agree on a "unit goal" of 30 loans referred by Primary Residential to All Star associated with this kickback and in furtherance of the Kickback and Cartel Agreements. Ex. 19, 8/30/2011 Email.

89.     A week later, on September 6, 2011, All Star pays an $800 kickback to Primary Residential laundered by and through Best Rate Referrals.  The sham invoice and email memorializing All Star's payment of the kickback appear as Exhibit 20 (a) – (b).

90.     According to the invoice, Primary Residential is receiving more "live transfer" calls from Best Rate Referral. Ex. 20 (a). Plaintiffs believe, and therefore aver, that the call center Best Rate Referrals uses to source these "live transfer" calls is not in Utah such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state, and being transferred to a Primary Residential branch or loan officer in a different state.

91.     All Star also chooses to transmit the kickback payment over interstate wires by faxing a credit card authorization originating from All Star's offices in Maryland and Primary

Residential receiving and accepting the kickback by and through Best Rate Referrals in Nevada. Ex. 20 (b).

92.    A month later, on October 7, 2011, All Star pays a $6,392.98 kickback to Primary Residential laundered through Salt Lake Mailing & Printing ("SLMP"), a Utah based marketing services company.   The sham invoice and email memorializing All Star's kickback payment appears as Exhibit 21 (a) – (b).

93.    The sham invoice states that SLMP produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 21 (a).  Based on the materials described on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations were sent by U.S. Mail and most, if not all, were delivered interstate; that is, the Primary Residential solicitation was placed in the U.S. mail in one state – Utah – and delivered to a borrower in a different state.

94.    In addition, All Star transmits the kickback payment over interstate wires by faxing a credit card authorization from All Star's offices in Maryland and Primary Residential receiving and accepting the kickback by and through SLMP in Utah. Ex. 21(b).

95.    All Star and Primary Residential agree to a "unit goal" of 40 loans assigned and referred by Primary Residential to All Star associated with the kickback payment and in performance of the Kickback and Cartel Agreements. Ex. 22, 10/5/2011 Email.

96.    In addition, All Star and Primary Residential conspire and agree to raise the fixed prices for title and settlement services on loans assigned and referred to All Star from Primary Residential to $1350. This increase raises the Settlement Fee Overcharge to $350 and the Marketing Surcharge to $250 per loan which amounts represent the minimum amount of actual damages caused Primary Residential borrowers from All Star and Primary

Residential's performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential conduct in furtherance of the All Star Scheme.  Ex. 23, 10/6/2011 Email.

97.   Primary Residential in fact assigns and refers loans to All Star in performance of the Kickback and Cartel Agreements in fulfillment of the "unit goals" associated with the kickbacks paid by All Star.  Ex. 24, 10/24/2011 Email.

98.   The following month, All Star pays a $5,315.29 kickback to Primary Residential laundered through SLMP. The sham invoice and email memorializing All Star's kickback payment appears as Exhibit 25 (a)-(b).

99.   The sham invoice states that SLMP produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 25(a). Based on the description on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state – Utah – and delivered to a borrower in a different state.

100.  Based on All Star's and Primary Residential's continuing pattern of practice, Plaintiffs believe and therefore aver that All Star transmits the kickback payment over interstate wires by faxing a credit card authorization from All Star's offices in Maryland and Primary Residential receiving and accepting the kickback by and through SLMP in Utah.

101.  Approximately two months later, on or around January 3, 2012, All Star pays a $6,600 kickback to Primary Residential laundered through Camber Marketing Group ("Camber"), a Georgia based marketing services company. The sham invoice and emails memorializing All Star's payment of the kickback appear as Exhibit 26 (a) – (b).

102.    The sham invoice states that Camber designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 26(a). Based on the description on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state – Georgia – and delivered to a borrower in a different state.

103.    In addition, All Star transmits the kickback payment over interstate wires with the wire originating with All Star's bank in Maryland with Primary Residential receiving and accepting the kickback by and through Camber's bank in Atlanta, Georgia. Ex. 26 (b).

104.    The next month, in mid-February, 2012, All Star pays a $7,750 kickback to Primary Residential laundered through Camber. The sham invoice and emails memorializing All Star's payment of the kickback appear as Exhibit 27(a)–(b).

105.    The sham invoice states that Camber designed, produced and mailed Primary Residential borrower solicitations to potential borrowers.  Ex. 27(a). Based on the description on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state –Georgia – and delivered to a borrower in a different state.

106.    In addition, All Star transmits the kickback payment over interstate wires, with the wire originating with All Star's bank in Maryland and Primary Residential receives and accepts the kickback by and through Camber's bank in Atlanta, Georgia. Ex. 27(b).

107.    All Star and Primary Residential agree to a "unit goal" of 60 loans assigned and referred by Primary Residential to All Star associated with the kickback payment and in

performance of the Kickback and Cartel Agreements. All Star and Primary Residential agree and reiterate that the kickback payment is made for Primary Residential's assignment and referral of "1 closed loan for every 1000 mailers." Ex. 28, 2/16/12 Email.

108. Primary Residential in fact assigns and refers loans to All Star in performance of the Kickback and Cartel Agreements in fulfillment of the "unit goals" associated with the kickbacks paid by All Star. Ex. 29, 6/22/2012 Email.

109. In July, 2012, All Star pays a $6,290 kickback to Primary Residential laundered by and through Camber. The sham invoices and payment record associated with this kickback appear as Exhibit 30(a)–(b).

110. The sham invoice states that Camber designs, produces and mails Primary Residential borrower solicitations to potential borrowers. Ex. 30(a). Based on the description on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state – Georgia – and delivered to a borrower in a different state.

111. In addition, All Star transmits the kickback payment over interstate wires by choosing to fax a credit card authorization from All Star's offices in Maryland and Primary Residential receives and accepts the kickback by and through Camber in another state, Georgia.

112. In January, 2013, All Star pays a $3,850 kickback to Primary Residential laundered by and through Camber. The Sham invoice and payment record associated with the kickback appears as Exhibit 31(a)-(b).

113.    The sham invoice states that Camber designed, produced and mailed Primary Residential borrower solicitations to potential borrowers. Ex. 31(a).  Based on the description on the invoice, Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state – Georgia – and delivered to a borrower in a different state.

114.    In addition, All Star transmits the kickback payment over interstate wires by faxing a credit card authorization from All Star's offices in Maryland, and Primary Residential receives and accepts the kickback by and through Camber in another state, Georgia.

115.    Just a month later, All Star pays $6,900 kickback to Primary Residential laundered by and through Lender Feeder LC ("Lender Feeder") a Utah based marketing services company. The sham invoice and email memorializing All Star's payment of the kickback appear as Exhibit 32 - 35.

116.    The sham invoice states that Lender Feeder mails Primary Residential borrower solicitations to potential borrowers.  Ex. 32.  Plaintiffs believe and therefore aver that these Primary Residential borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the Primary Residential solicitation is placed in the U.S. mail in one state – Utah – and delivered to a borrower in a different state.

117.    In addition, All Star transmits the kickback payment using interstate mails by sending through the U.S. mail a check drawn and mailed from All Star's offices in Maryland, and Primary Residential receives and accepts the kickback by and through Lender Feeder in another state, Utah.

118. All Star and Primary Residential also agree to raise the fixed price to $1600 on Primary Residential loans assigned and referred to All Star under the Kickback and Cartel Agreements. Primary Residential states the new fixed price includes a $700 Marketing Surcharge which amount is the minimum amount of actual damages caused Primary Residential borrowers from All Star and Primary Residential's performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential conduct in furtherance of the All Star Scheme. Ex. 33, 1/25/2013 Email.

119. All Star and Primary Residential agree to a "unit goal" of 25 loans assigned and referred by Primary Residential to All Star associated with the kickback payment and in performance of the Kickback and Cartel Agreements. Ex. 34, 1/29/2013 Email. All Star reiterates that "Just so I am clear, I'm not dropping $1 more until we close 25 NEW loans." Ex. 35, 2/6/2013 Email.

120. All Star's records indicate that Primary Residential participated in the All Star Scheme through, at least, January, 2016 assigning and referring loans to All Star and All Star charging borrowers the fixed prices pursuant to the Cartel Agreements.

121. Based on the continuing pattern of practice between All Star and Primary Residential, Plaintiffs believe, and therefore aver, that All Star and Primary Residential conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown Primary Residential Branches, branch managers and loan officers in furtherance and performance of the All Star Lender Cartel and the Cartel Agreements, including a Primary Residential branch located at 1220 A. East Joppa Road, Suite 118, Towson, Maryland.

122. Based on the continuing pattern of practice between All Star and Primary Residential, Plaintiffs believe, and therefore aver, that All Star pays, and Primary Residential receives, kickbacks in exchange for Primary Residential's assignment and referral of loans from additional known and unknown Primary Residential branches, branch managers and loan officers in furtherance and performance of the Kickback Agreement.

123. Based on the continuing pattern of practice between All Star and Primary Residential, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to Primary Residential laundered by and through other third party marketing companies in addition to those identified herein.

124. Based on the continuing pattern of practice between All Star and Primary Residential, Plaintiffs believe, and therefore aver, that All Star and Primary Residential use and cause to be used the United States mail and/or interstate wires to identify and solicit borrowers that are the currency of the Kickback and Cartel Agreements between All Star and Primary Residential.

125. All Star and Primary Residential's performance of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential conduct in furtherance of the All Star Scheme cause Primary Residential borrowers, including Plaintiffs and alleged Class Members, harm because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback free title and settlement services, and were denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

126.    No title services were provided by Primary Residential, or any Primary Residential employee and/or agent, associated with the receipt and acceptance of any kickback. The payment by All Star and the receipt and acceptance by Primary Residential of the kickbacks was made solely for the assignment and referral of Primary Residential loans to All Star.

### FACTUAL ALLEGATIONS RELATED TO
### THE INDIVIDUAL CLASS REPRESENTATIVE

127.    On or about October, 2012, Plaintiff Richard Donaldson obtains a residential mortgage loan from Primary Residential through Richard Timpson, a loan officer and branch manager Primary Residential employs at the Primary Residential Hildale Branch, in relation to the purchase of residential real property located at 805 Walnut Grove Road, Baltimore, Maryland, 21221. Donaldson's Primary Residential loan closes on or about October 24, 2012.

128.    Timpson assigns and refers the Donaldson loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star pays to Primary Residential on July 20, 2012, by and through Camber, thereby performing the Kickback and Cartel Agreements, depriving Donaldson of his choice of title and settlement service provider, and denying Donaldson kickback-free title and settlement services.

129.    All Star charges Donaldson $1350 in total title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements. The price for title and settlement service fees All Star charges Donaldson are supracompetitive and higher than the same charges would have been without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

130.    These title and settlement service fees included the $350 Settlement Fee Overcharge and $250 Marketing Surcharge described in ¶96 which is the minimum amount of Donaldson's actual damages resulting from the All Star Scheme, Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme.

131.    All Star disburses proceeds from the Donaldson's Primary Residential loan in payment of these title and settlement service charges.

132.    As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme, Donaldson is harmed because he is: (i) charged and pays more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

133.    As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme, Donaldson was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements or the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All

Star Scheme, and suffered actual damages in the amount of at least $600 and, on information and belief, additional amounts.

134.    On or about April 23, 2015, Walter and Dawn Sperl obtain a residential mortgage loan from Primary Residential secured by real property located at 1906 Atkisson Road, Joppa, Maryland, 21805.  The Sperls' Primary Residential refinance closes on or about April 23, 2015. Ex. 36, Sperl HUD-1.

135.    The Sperls believe, and therefore aver, that Primary Residential assigns and refers their loan to All Star Plaintiffs in performance of the Kickback and Cartel Agreements, depriving the Sperls of their choice of title and settlement service provider, and denying the Sperls kickback-free title and settlement services.

136.    All Star charges the Sperls $1,631.35 in total title and settlement service fees thereby performing the Price Fixing and Minimum Fee Agreements.  These title and settlement service fees include the $700 Marketing Surcharge described in ¶118, which amount constitutes the minimum amount of the Sperls' actual damages proximately caused by the Cartel Agreements and pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

137.    All Star disburses proceeds from the Sperls' Primary Residential loan in payment of these title and settlement service charges as reflected on the Sperls' HUD-1. Ex. 36.

138.    As a direct and proximate result of the All Star Scheme, Kickback and Cartel Agreements, and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme, the Sperls were harmed because they were: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements, and the pattern of racketeering activity All

Star and Primary Residential perform in furtherance of the All Star Scheme; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

139. As a direct and proximate result of the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme, the Sperls were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of at least $700 and, on information and belief, additional amounts.

140. Plaintiffs' transactions and the course of events thereafter exemplify the working of the All Star Scheme, Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme and are typical of all alleged Class Members' transactions.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

141. Essential to the All Star Scheme, Primary Residential, as well as other members of the All Star Lender Cartel, and All Star undertook affirmative acts that fraudulently concealed the Kickback and Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

### I.    All Star and Primary Residential's Laundering of Kickbacks through Third Party Marketing Companies and Use of Sham Invoice and Payment Records.

142.    As described in ¶22 above, Primary Residential and All Star concealed the fact and payment of kickbacks by laundering kickbacks through third party marketing companies.

143.    As described in ¶¶24-29, Primary Residential and All Star further concealed the illegal kickbacks and Kickback Agreement through the creation of sham invoices and payment records.

144.    These sham invoices and payment records created an ongoing false record concealing and preventing discovery of the fact that any thing of value was exchanged between Primary Residential and All Star related to the assignment and referral of Primary Residential loans, including Plaintiffs' loans, the actual payment and receipt and acceptance of illegal kickbacks, and Primary Residential's coordinated business relationship with All Star.

### II.    Primary Residential and All Star's Fraudulent Marketing Representations

145.    To conceal the Price Fixing, Minimum Fee Agreements, and the Kickback Agreement, and the resulting supracompetitive prices charged Primary Residential borrowers for title and settlement services, Primary Residential and All Star make false representations to borrowers in marketing materials.

146.    In direct mail solicitations of borrowers, Primary Residential represents that a borrower will  "Save 30% when you use All Star" or "Save 30 to 40% when you use All Star". See, e.g., Ex. 37(a)-(b), Primary Residential Borrower Solicitations.

147.     These representations are false because: (i)  a borrower can not save any percentage of title fees with All Star, but instead will be charged higher and supracompetitive fees under the Cartel Agreements and to fund the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme; (ii) a borrower will not

receive any discount for using All Star Title, but instead would be charged higher and supracompetitive fees under the Cartel Agreements and to fund the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme; (iii) the reason the Primary Residential broker wants a borrower to use All Star is for the Primary Residential broker to obtain kickbacks and to perform its obligations under the Cartel Agreements and to fund the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme, not because the borrower will or can receive lower fees; and (iv) any borrower responding to the direct mail solicitation will not "choose" All Star, but will be assigned and referred by Primary Residential to All Star.

### III. Primary Residential and All Star's False Allocation of Fees and APR Manipulation

148. The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus the cost to the borrower of certain fees associated with the loan. The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders must report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

149. Not all title and settlement service fees are included in the APR calculation. TILA identifies the title and settlement service fees that are excluded from the APR calculation. 12 C.F.R. §1026.4(c). Because some fees are excluded from the APR (and others are not)

title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that TILA excludes from the APR calculation.

150. As a regular and continuing business practice, Primary Residential and All Star choose to falsely allocate the charges for title and settlement services associated with a borrower's loan to only those categories of title services TILA excludes from the APR calculation, thereby falsely minimizing the APR reported on Primary Residential borrowers' loan documents and required federal disclosures.

151. For example, "fees for title examination" and "abstract of title" are excluded from the APR calculation – see, 12 C.F.R. §1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation.   See 12 C.F.R. §1026.4(a)(1)(i). By allocating the charges associated with conducting a settlement or closing with a borrower, or those charges associated with conducting an application signing with a borrower, to the category of "title exam" or "abstract" the result is a false, and falsely minimized, APR.

152. All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the Participating Lender's APR.   Ex. 38, 6/6/11 Email; Ex. 39, 9/24/15 Email; Ex. 40, 10/6/15 Email.

153. Primary Residential participates in the same false allocation of fees and manipulation of the APR, and ratifies the false allocation of fees on loans assigned and referred to All Star under the Kickback and Cartel Agreements.

154.    Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star and Primary Residential engage in the false allocation and manipulation of the APR throughout the time period Primary Residential is participating in the All Star Scheme.

155.    Primary Residential's and All Star's choice to falsely allocate fees results in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to Primary Residential borrowers.

156.    As a regular business practice, All Star uses various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APR associated with a loan. All Star chooses to program this software, including Titlehound, to automatically execute these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce Primary Residential loan documents to present to borrowers and on which Primary Residential and All Star intend borrowers rely. See e.g., Ex. 41, 2/20/15 Email.

157.    Primary Residential and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently conceals from borrowers the coordinated business relationship between Primary Residential and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme, and affirmatively prevents Primary Residential borrowers from discovering their injuries resulting therefrom.

**IV. False Representations in Primary Residential Borrowers' Loan Documents**

158.    Primary Residential and All Star choose to make other false representations on borrowers' loan documents.

159.    At all relevant times, federal law requires Primary Residential, as a lender, to provide a "Good Faith" Estimate to a borrower within three days of taking a loan application. 12 C.F.R. §1024.7(a)-(b).

160.    Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

161.    As a regular pattern of practice, Primary Residential falsely includes in Block 4 charges that are not title services and lender's title insurance including, the Settlement Fee Overcharge (see ¶¶73, 96), and the Marketing Surcharge (see ¶¶72, 96, 118) associated with the Price Fixing and Minimum Fee Agreements.

162.    Primary Residential's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between Primary Residential and All Star under the Kickback and Cartel Agreements.

163.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD- Settlement Statement at the closing or settlement of a loan.  The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

164. Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

165. As a continuing pattern and regular business practice, Primary Residential and All Star choose and cause the false allocation of fees described in ¶¶ 148 - 157, to repeat and appear on Primary Residential borrowers' HUD-1 statements in Section 1100.

166. As a continuing pattern  and regular business practice, Primary Residential omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the  kickback received by  Primary Residential related to the borrower's loan or the fact that All Star has  paid a kickback to Primary Residential for the assignment and referral of the borrower's loan.  Primary Residential is required to report the kickback on Line 801 or Line 808 of the HUD-1.

167. As a continuing pattern of practice, Primary Residential omits and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Settlement Fee Overcharge, Marketing Surcharge, or other flat fee associated with the fixed prices under the Kickback and Cartel Agreements.  Primary Residential is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

168. These false representations and omissions, presented to Primary Residential borrowers by All Star as Primary Residential's agent at closing, fraudulently conceals: (i) the charges and amounts associated with the over charges, surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between Primary Residential and All Star under the

Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary residential perform in furtherance of the All Star Scheme.

169. Individually and collectively, Primary Residential and All Star's affirmative acts of concealment –  the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents – are outside the control of Primary Residential borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, Primary Residential and All Star.

### V.  Plaintiffs' Reasonable Diligence

### i.  Donaldson's reasonable diligence.

170. As a result of the fraudulent concealments by Primary Residential and All Star, Donaldson has no actual notice before, at or after the closing of his Primary Residential loan of the illegal kickbacks, the exchange of any thing of value between Primary Residential and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Primary Residential or All Star under the Kickback and Cartel Agreements the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

171. Donaldson exercises reasonable diligence before, during and after the closing of his loan.

172. Donaldson receives loan documents prepared by Primary Residential in advance of his closing and reviews those loan documents.  Donaldson's pre-closing loan documents

include Donaldson's "Good Faith" Estimate which Plaintiffs believe, and therefore aver, Primary Residential prepared. Donaldson is not in possession of the "Good Faith" Estimate issued regarding his Primary Residential loan and believes that document is in the sole possession of Primary Residential.

173. Donaldson believes, and therefore avers, that his "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between Primary Residential and All Star, or the fact that All Star has paid anything of value for Primary Residential's assignment *an*d referral of Donaldson's loan to All Star.

174. Donaldson's "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 159 - 162 above.

175. Donaldson's pre-closing documents reflect Primary Residential and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 148 - 157.

176. The false statements and omissions made in Donaldson's pre-closing loan documents are made for the purposes of concealing, and did so conceal from Donaldson, the coordinated business relationship between Primary Residential and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Donaldson's loan, and the supracompetitive nature of prices charged Donaldson for title and settlement services.

177. As is reasonable under the circumstances, Donaldson believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Donaldson does not believe, that: (i) a coordinated business relationship exists between Primary Residential and All Star; (ii) there has been any

payment or exchange of a thing of value between Primary Residential and All Star related to the assignment and referral of Donaldson's Primary Residential loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between Primary Residential and All Star and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

178.    Donaldson acts diligently during the closing or settlement of his loan.  As a condition of funding his loan, Primary Residential requires Donaldson to participate in a closing, and Donaldson attends and fully participates in the required closing, and reviews all documents with All Star's representative.

179.    At the closing of his loan, Donaldson receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Donaldson reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

180.    Primary Residential and All Star choose to omit from the documents Donaldson receives at his closing, including Donaldson's HUD-1, any description or statement of the coordinated business relationship between Primary Residential and All Star under any of the Kickback or Cartel Agreements.

181.    Primary Residential and All Star choose to omit from the documents Donaldson receives at his closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Primary Residential related to Donaldson's loan.

182.  Primary Residential and All Star choose to include in the documents Donaldson receives at his closing, including his HUD-1, the false allocation of fees as described in ¶¶ 148 - 157, 165.

183.  Primary Residential and All Star choose to include in the documents Donaldson receives at his closing, including his HUD-1, the false representations and omissions described in ¶¶ 163 - 168.

184.  Primary Residential and All Star make the false representations and omissions in Donaldson's loan closing documents for the purposes of concealing, and did so conceal from Donaldson, the coordinated business relationship between Primary Residential and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Donaldson's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and Donaldson's injuries and actual damages therefrom.

185.  As is reasonable under the circumstances, Donaldson believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Donaldson does not believe, that: (i) a coordinated business relationship exists between Primary Residential and All Star, (ii) there has been any payment or exchange of a thing of value between Primary Residential and All Star related to the assignment and referral of Donaldson's loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Primary Residential and All Star and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

41

186.   Donaldson acts diligently after his closing.  On or about November 9, 2018, Donaldson receives a letter from undersigned counsel describing an investigation of All Star and Primary Residential.  This is Donaldson's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to his Primary Residential loan.

187.   Within a week Donaldson contacts and retains counsel.  Donaldson files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

188.   As a result of the Primary Residentials and All Star's fraudulent concealment, and Donaldson's reasonable diligence before, during and after the closing of his loan, the statute of limitations related to Donaldson's claims was tolled beginning on the date of his loan closing and continuing until Donaldson's learning of facts giving rise to his causes of action, on or about November 9, 2018.

### ii. The Sperls' Reasonable Diligence

189.   As a result of the fraudulent concealments by Primary Residential and All Star,  the Sperls have no actual notice before, at or after the closing of their Primary Residential loan of the illegal kickbacks, the exchange of any thing of value between Primary Residential and All Star, the Price Fixing and Minimum Fee Agreements, the resulting fixed and supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of Primary Residential or All Star under the Kickback and Cartel Agreements and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

190.    The Sperls exercise reasonable diligence before, during and after the closing of their refinance.

191.    The Sperls receive loan documents prepared by Primary Residential in advance of their closing and review those loan documents.

192.    Plaintiffs believe, and therefore aver, that the Sperls' pre-closing loan documents include a "Good Faith" Estimate prepared by Primary Residential. The Sperls are not in possession of the "Good Faith" Estimate issued regarding their Primary Residential refinance and believe that document is in the sole possession of Primary Residential.

193.    Plaintiffs believe, and therefore aver, that Primary Residential and All Star choose to omit from the Sperls' "Good Faith" Estimate any description or statement of the coordinated business relationship between Primary Residential and All Star and to include the fraudulent representations *a*nd omissions described in ¶¶ 159 - 162. Plaintiffs believe and therefore aver that the Sperls' "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Sperls' refinance.

194.    Plaintiffs believe, and therefore aver, that Primary Residential and All Star include in the Sperls pre-closing documents Primary Residential and All Star's false allocation of fees and a false APR as described in ¶¶ 148 - 157.

195.    Primary Residential and All Star make the false statements and omissions in the Sperls' pre-closing loan documents for the purposes of concealing, and did so conceal from the Sperls, the coordinated business relationship between Primary Residential and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Sperls' loan, and the fixed and supracompetitive nature of prices charged the Sperls for title and settlement services.

196.   As is reasonable under the circumstances, the Sperls believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Sperls did not believe, that: (i) a coordinated business relationship exists between Primary Residential and All Star; (ii) there has been any payment or exchange of a thing of value between Primary Residential and All Star related to the assignment and referral of the Sperls Primary Residential loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive or the result of Kickback and Cartel Agreements between Primary Residential and All Star and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

197.   The Sperls act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Primary Residential requires the Sperls to participate in a closing, and the Sperls attend and fully participates in the required closing.

198.   At the closing of their loan, the Sperls receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Sperls review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

199.   Primary Residential and All Star choose to omit from the documents the Sperls receive at closing, including the Sperls' HUD-1, any description or statement of the coordinated business relationship between Primary Residential and All Star under any of the Kickback or Cartel Agreements. Ex. 36, Sperls HUD-1.

200.   Primary Residential and All Star choose to omit from the documents the Sperls receive at closing, including the Sperls' HUD-1, any description or statement of any payment,

44

amount or thing of value that was paid by All Star to Primary Residential related to the Sperls' loan.  Ex. 36.

201.    Primary Residential and All Star choose to include in the documents the Sperls receive at closing, including the Sperls HUD-1, the false allocation of fees as described in ¶¶ 148 - 157 and the resulting fraudulent representations and omissions as described in ¶¶ 163 - 168.  Ex. 36.

202.    Primary Residential and All Star make the fraudulent omissions and representations and false certifications in the Sperls' loan closing documents  for the purposes of concealing, and did so conceal from the Sperls, the coordinated business relationship between Primary Residential and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Sperls' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and the Sperls' injuries and actual damages therefrom.

203.    As is reasonable under the circumstances, the Sperls believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Sperls do not believe, that: (i) a coordinated business relationship exists between Primary Residential and All Star; (ii) there has been any payment or exchange of a thing of value between Primary Residential and All Star related to the assignment and referral of the Sperls' loan for title and settlement services; (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between Primary Residential and All Star and the pattern of racketeering activity All Star and Primary Residential perform in furtherance of the All Star Scheme.

204.    The Sperls act diligently after their closing.  On or about January 19, 2019, the Sperls
receive a letter from undersigned counsel describing an investigation of All Star and
Primary Residential.  This is the Sperls first indication of any potential wrongful, illegal,
and/or actionable conduct by anyone.

205.    Within days, the Sperls contact and retain counsel.  The Sperls file this Complaint within
weeks of becoming aware of facts giving rise to their causes of action.

### VI. Accrual and Tolling of Limitations

206.    The Sperls' claims pursuant to pursuant to 15 U.S.C. §1 and 18 U.S.C. §1964 accrued at
the earliest, for the purpose of the limitations period provided in 15 U.SC. §15(b), on the
date of their injury, that is on or about April 23, 2015, the date loan proceeds were
disbursed and the Sperls incurred and paid the fixed and supracompetitive prices resulting
from the Kickback and Cartel Agreements, and the pattern of racketeering activity All
Star and Primary Residential perform in furtherance of the All Star Scheme.  The Sperls
claims are brought within four years of that date, and are not subject to any limitations
defense.

207.    In addition, and in the alternative, the limitations period provided in 15 U.SC. §15(b),
applicable to claims pursuant to 15 U.S.C. §1 and 18 U.S.C. §1964, is subject to the
discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied*
1997 U.S. LEXIS 4626.    Primary Residential's affirmative acts precluded Primary
Residential borrowers, including all Plaintiffs and Class Members, from discovering the
fixed and supracompetitive nature of the prices charged for title and settlement services,
and affirmatively prevented Primary Residential borrowers, including Plaintiffs and Class
Members, from discovering the fact of their injuries resulting therefrom.

208.    As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. §1 and 18 U.S.C. §1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. §15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury - for Donaldson, on or about November 9, 2018, and for the Sperls, on or about January 19, 2019.

209.    In addition and in the alternative, as a result of Primary Residential's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for Donaldson, on or about November 9, 2018, and for the Sperls, on or about January 19, 2019.

210.    Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the equitable tolling of applicable limitations period.

**COUNT I**
**Violation of the Real Estate Settlement Procedures Act (RESPA),**
**12 U.S.C. § 2607(a)**

211.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

212.    All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

213. Primary Residential by and through its brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

214. All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by Primary Residential and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

215. The payment and/or arranging of payment of kickbacks to Primary Residential by All Star and Primary Residential's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

216. Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Primary Residential Mortgage Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between October 1, 2009, and January 31, 2016. Exempted from this class is any person who, during the period of October 1, 2009 through January 31, 2016, was an employee, officer, member and/or agent of Primary Residential Mortgage Inc. or All Star Title, Inc.

> (the "RESPA Class").

217. There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a.    Whether there existed a referral agreement between Primary Residential and All Star whereby Primary Residential agreed to assign and refer Primary Residential loans, refinances and reverse mortgages to All Star in return for kickbacks;

b.    Whether Primary Residential and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.    Whether the illegal kickbacks to Primary Residential and its employees and/or agents violated RESPA;

d.    Whether Primary Residential and All Star used third party marketing companies to launder kickbacks related to Primary Residential loans;

e.    Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f.    Whether Primary Residential used sham invoices and payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.    Whether Primary Residential disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Primary Residential and All Star related to any borrower's loan;

h.    Whether Primary Residential disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document Primary Residential's coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Primary Residential and All Star related to any borrower's loan;

i.    Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

    j.    Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

    k.    Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

218.    These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

219.    Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

220.    Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The Plaintiffs' interests and the interests of all other members of the RESPA Class are identical.

221.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class' interests.

222.    The RESPA Class consists of borrowers on more than 150 loans, and thus are so numerous that joinder of all members is impracticable.

223.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Primary Residential Bank.

224.    This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class

action is superior to other available methods of fair and efficient adjudication of this litigation.

225.   Most members of the RESPA Class are unaware of their rights to prosecute a claim against Primary Residential and/or its successor in interest, Defendant First Federal Bank.

226.   No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT II**
**Violation of the Sherman Act,**
**15 U.S.C. § 1**

227.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

228.   All Star and Primary Residential conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans involving property in more than 15 states, in violation of the Sherman Act, 15 U.S.C. § 1.

229.   As a direct and proximate result of the Cartel Agreements between Primary Residential and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

230.   As a direct and proximate result of the Cartel Agreements between Primary Residential and All Star, Plaintiffs were injured and suffered actual damages in the amount of at least $250.

231.   Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. §1 ("Anti Trust Class"), with the alleged Anti Trust Class defined as:

All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or brokered by Primary Residential Mortgage Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between October 1, 2009, and January 31, 2016. Exempted from this class is any person who, during the period of October 1, 2009, through January 31, 2016, was an employee, officer, member and/or agent of Primary Residential Mortgage Inc. or All Star Title, Inc.

232. The Anti-Trust Class consists of borrowers on more than 150 loans, and thus are so numerous that joinder of all members is impracticable.

233. There are questions of law and fact common to the claims of each and all members of the Anti-Trust Class. These common questions include, but are not limited to:

a. Whether Primary Residential and its employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Anti Trust Class Members, and

b. Whether Primary Residential and its employees and/or agents violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all Primary Residential loans generated by the Kickback Agreement;

c. Whether the prices charged Primary Residential borrowers pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

d. Whether Primary Residential's made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

e.  Whether Primary Residential and All Star falsely allocated fees and otherwise manipulated APR calculation on Class Members' loans to actively conceal the Cartel Agreements and the supracompetitive prices charged Primary Residential borrowers in performance of those agreements;

f.  Whether Primary Residential and All Star made false representations on Primary Residential borrowers Good Faith Estimates, HUD-1 and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged Primary Residential borrowers in performance of those agreements;

g.  Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

h.  Whether Plaintiffs and the Anti Trust Class are entitled to treble damages under the Sherman Act; and

i.  Whether Plaintiffs and the Anti Trust Class are entitled to attorneys' fees and expenses under the Sherman Act.

234.  These common issues of law and fact predominate over any question affecting only individual Anti Trust Class Members.

235.  Plaintiffs' transaction and claims are typical of the claims or defenses of the respective Anti Trust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

236.  Plaintiffs will fairly and adequately protect the interests of the Anti-Trust Class. The interests of the named Plaintiffs and all other members of the Anti-Trust Class are identical.

237.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Anti Trust Class's interests.

238.  Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Primary Residential.

239.  This action entails questions of law and fact common to Anti Trust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

240.  Most members of the Anti Trust Class are unaware of their rights to prosecute a claim against Primary Residential.

241.  No member of the Anti-Trust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT III
## Violations of Racketeer Influenced & Corrupt Organizations Act (RICO)
## 18 U.S.C. §1962

242.  Plaintiffs incorporate the above stated paragraphs as if restated herein.

243.  Primary Residential is a person for the purposes of 18 U.S.C. §1962(a).

244. The All Star Scheme constitutes an enterprise for the purposes of 18 U.S.C. §1962(a). The activities of the All Star Scheme Enterprise affect interstate commerce across more than 30 states.

245. Primary Residential and All Star perpetrated the All Star Scheme for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related to Primary Residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property.

246. The use of the U.S. Mail and interstate wires by Primary Residential and All Star in furtherance of the All Star Scheme, as pled herein, constitutes a pattern of racketeering activity.

247. Primary Residential receives income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to Primary Residential, and through the interest, fees and other income earned on the Primary Residential mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

248. Primary Residential improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the All Star Scheme Enterprise and for the purpose of luring borrowers into the All Star Scheme Enterprise in violation of 18 U.S.C. §1962.

249. As a direct and proximate result of Primary Residential's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $250.

250. Plaintiffs allege claims pursuant to 18 U.S.C. 1964(c) on their behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. §1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or brokered by Primary Residential Mortgage Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between October 1, 2009, and January 31, 2016. Exempted from this class is any person who, during the period of October 1, 2009, through January 31, 2016, was an employee, officer, member and/or agent of Primary Residential Mortgage Inc. or All Star Inc.

251. The RICO Class consists of borrowers on more than 150 loans, and thus are so numerous that joinder of all members is impracticable.

252. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

j.  Whether Primary Residential and All Star formed an enterprise;

k.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

l.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

m.  Whether Primary Residential and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise,

n.  Whether Primary Residential and All Star used the interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

o.  Whether Primary Residential received income from a pattern of racketeering activity;

  p. Whether Primary Residential used income derived from a patter of racketeering activity in support of, or in furtherance of, the All Star Scheme Enterprise;

  q. Whether Primary Residential actively conceal the All Star Scheme, the supracompetitive prices and

  r. Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from Primary Residential's violation of 18 U.S.C. 1962(a);

  s. Whether Primary Residential and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members from discovering their injuries proximately caused by the Primary Residential's pattern of racketeering activity;

  t. Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. §1964(c); and

  u. Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. §1964(c).

253. These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

254. Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RICO Class Members.

255. Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

256. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

257.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Primary Residential.

258.    This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

259.    Most members of the RICO Class are unaware of their rights to prosecute a claim against Primary Residential.

260.    No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a.    This Court to certify the RESPA, Anti-Trust and/or RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b.    Judgment for Plaintiffs and RESPA Class Members against Primary Residential Mortgage Inc., and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.    Demand judgment for Plaintiffs and Anti Trust Class Members against Primary Residential Mortgage Inc. and award Plaintiffs and Anti Trust Class Members damages

in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d.  Demand judgment for Plaintiffs and RICO Class Members against Primary Residential Mortgage Inc. and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by Primary Residential's pattern of racketeering activity;

e.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and/or 18 U.S.C. §1964(c); and

f.  For such other and further relief as this Court deems proper.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |

## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs and Class Members*

Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*Counsel for Plaintiffs and Class Members*