IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD DONALDSON, *et al.*,

    *Plaintiffs*,

    v.

PRIMARY              RESIDENTIAL
MORTGAGE, INC.,

    *Defendant*.

Civil Action No. ELH-19-1175

## MEMORANDUM OPINION

This putative class action concerns an alleged kickback scheme between defendant Primary Residential Mortgage, Inc. ("PRMI" or "Primary Residential") and All Star Title, Inc. ("All Star").  Plaintiffs Richard Donaldson and Walter and Dawn Sperl, who are mortgagors, have sued defendant PRMI, alleging that PRMI made referrals of their loans and the loans of others to All Star for title and settlement services and, in exchange, All Star laundered payments to PRMI, largely through third party marketing companies.  As a result of the scheme, plaintiffs allegedly paid inflated settlement fees.  *See* ECF 1 (the "Complaint").  In particular, plaintiffs allege that the kickback scheme violates Section 8(a) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a) (Count I) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count III).[1]  The Complaint, which is about 60 pages in length, is supported by more than 40 exhibits.

Primary Residential has moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(2).  They assert that plaintiffs lack standing to advance their claims;

---

[1] In Count II of their suit, plaintiffs also alleged a violation of the Sherman Act, 15 U.S.C. § 1.  But, they subsequently withdrew that claim.  *See* ECF 14.

have failed to state a claim; and the Court lacks personal jurisdiction with regard to the claims of certain putative class members.  ECF 9.  The motion is supported by a memorandum of law (ECF 9-1) (collectively, the "Motion") and an exhibit.  ECF 9-2.  Plaintiffs oppose the Motion (ECF 12), supported by a memorandum of law (ECF 12-1) (collectively, the "Opposition"). Defendant has replied.  ECF 13.  The parties have also directed the Court's attention to supplemental authority.  *See* ECF 14; ECF 19.

All Star is not a party to this case.  But, All Star's conduct is at issue here and in other suits in this District.  Plaintiffs' lawyers in this case are also counsel to the plaintiffs in the other cases involving All Star in this District.  *See Somerville v. West Town Bank & Trust*, PJM-19- 0490; *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595; *Ekstrom v. Congressional Bank*, ELH-20-1501.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.   Factual Background[2]

### A.  The Scheme

According to plaintiffs, Primary Residential, through its agents and employees, "received and accepted illegal kickbacks [from All Star] in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services. . . ."  ECF 1, ¶ 3.  Further, plaintiffs assert that the borrowers of PRMI absorbed the

---

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  Further, the Court may consider documents attached to the Complaint or the Motion, "so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

The Court cites to the electronic pagination.  This does not always correspond to the pagination that appears in the parties' submissions.

"supracompetitive charges for title and settlement services," because the charges "were financed into the borrower's loans…."  *Id.* ¶ 5.  In furtherance of this scheme, plaintiffs contend that Primary Residential "laundered the kickbacks through third party marketing companies," *id.* ¶ 3, and "continuously and regularly used the U.S. Mail and interstate wires," in furtherance of the scheme, "over a period of at least five years. . . ."  *Id.* ¶ 6.

Plaintiffs allege that since at least 2008, All Star "design[ed] and execut[ed] a scheme. . . with lenders and their mortgage brokers, loan officers and other employees. . . to charge borrowers higher prices for title and settlement services and defraud borrowers of their money through the use of U.S. Mail and wires."  *Id.* ¶ 16.  According to plaintiffs, in exchange for "assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services," All Star paid "kickbacks" to mortgage lenders, based on the number of loans referred to All Star and the amount of profit All Star derived from the loan referrals.  *Id.* ¶¶ 17, 18.  Pursuant to the alleged scheme, All Star "charge[d] borrowers higher prices for title and settlement services than is possible in a competitive market," and was able "to exclude other title and settlement service companies from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages."  *Id.* ¶ 30.  Through these agreements, plaintiffs contend that All Star sought to "exclude All Star's competitors from the market for title and settlement services. . . and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks."  *Id.* ¶ 36.

According to plaintiffs, these kickbacks took various forms.  All Star sometimes purchased "marketing materials" for the mortgage lenders, "most commonly postage to be used by a [mortgage] lender to send direct mail solicitations."  *Id.* ¶ 20.  This money was paid directly to a "third party marketing company" and applied "to an invoice for marketing services for the

benefit" of the participating mortgage lender.  *Id.* ¶ 22.  These third-party marketing companies, including Best Rate Referral, Influence Direct, and Camber Marketing Group, "specializ[ed]" in direct mail solicitations, production for direct mail solicitations, and "'live transfer' leads," in which potential borrowers who call a "centralized telemarketing company" are transferred "'live'" to a participating lender.  *Id.* ¶ 23.  On other occasions, All Star wrote checks directly to the mortgage lenders, which were deposited into a "sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same."  *Id.* ¶ 21.

Moreover, plaintiffs allege that All Star and the participating lenders requested the third-party marketing companies to "issue sham invoices falsely stating the payment [was] being made by All Star for the purpose of purchasing marketing services from the third party marketing company."  *Id.* ¶ 24.  These invoices, according to plaintiffs, "creat[ed] the false impression that All Star [was] purchasing marketing services" for itself, rather than on behalf of the participating mortgage lender.  *Id.*  Plaintiffs assert that the payments were actually kickbacks to the participating lenders, made "in exchange for the assignment and referral of loans to All Star under the Kickback Agreement."  *Id.*  The "sham invoices conceal[ed] the fact that any thing of value [was] exchanged between All Star" and the mortgage lender.  *Id.* ¶ 25.  Sometimes, the invoices were "split" between All Star and the mortgage lender, *id.* ¶ 26, concealing the "coordinated business relationship" between All Star and the lender because the lender was not identified on the invoice paid by All Star.  *Id.* ¶ 27.

Further, plaintiffs allege that All Star and the mortgage lenders "conceal[ed] the kickback payment[s] entirely by creating sham payment records."  *Id.* ¶ 28.  To accomplish the concealment, the participating mortgage lender would allegedly direct All Star "to launder a

kickback through the third-party marketing company without the use or issuance of any invoice." *Id.*

According to plaintiffs, All Star and various mortgage lenders "conspire[d] to and form[ed] a cartel. . .", *id.* ¶ 31, in order to "fix the prices All Star charges the [mortgage lenders'] borrowers for title and settlement services on loans assigned and referred to All Star. . . ." *Id.* ¶ 32. They also agreed on minimum prices to charge borrowers. *Id.* ¶ 33. According to plaintiffs, these agreed-upon prices were "supracompetitive and higher than the prices that borrowers would have been charged for title and settlement services" in the absence of these agreements. *Id.* ¶ 35. The participating mortgage lenders agreed to "refuse to deal with any other title and settlement services company on those loans generated by All Star-funded kickbacks. . . ." *Id.* ¶ 34. The mortgage lenders benefited from these agreements because the higher prices resulted in higher interest and commissions, and because "the costs for title and settlement services fees were financed into the loan and paid for by borrowers from loan proceeds such that the [mortgage lenders] earn[ed]  interest and other fees on the supracompetitive pricing." *Id.* ¶ 37.

In addition, plaintiffs contend that All Star and the participating mortgage lenders "use[d] the kickback payments to lure borrowers into the All Star Scheme, and in turn use[d] the interstate mails and wires to identify, solicit and lure borrowers" into the scheme. *Id.* ¶ 39. According to plaintiffs, some of the third party marketing companies would generate "leads lists," *id.* ¶ 40, which were then used to target "printed direct mail pieces. . .that encourage borrowers to contact the [mortgage lenders] and apply for a residential mortgage loan, refinance or reverse mortgage." *Id.* ¶ 41. These mailers included "false representations," including that a borrower would save "30-40% on title fees" through All Star. *Id.* ¶ 42. These false representations, according to plaintiffs, served to "prevent a borrower from trying to use a

different title and settlement services company" and to "create the false impression that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors." *Id.*

Plaintiffs also allege that All Star and the mortgage lenders used the leads generated by the third-party marketing companies "to solicit borrowers over the telephone and internet. . ." and to use "interstate wires to make these telemarketing calls to potential borrowers." *Id.* ¶ 44. According to plaintiffs, All Star requires the mortgage lenders "to make false representations" in these calls that are similar to those on the mail pieces. *Id.* Further, plaintiffs contend that live transfer leads, which utilize interstate wires, resulted in the mortgage lenders "negotiating, agreeing to and enforcing the fixed prices. . . ." *Id.* ¶¶ 45, 47. And, plaintiffs assert: "All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme." *Id.* ¶ 46.

### B.   PRMI

Plaintiffs allege that by "at least October, 2009" PRMI accepted and received "kickbacks paid by All Star in exchange for the assignments and referral of Primary Residential brokered loans to All Star for title and settlement services." *Id.* ¶ 49; *see id.* ¶ 52. According to plaintiffs, Primary Residential initially agreed to refer loans from its branch on Joppa Road in Baltimore. *Id.* ¶ 52.

According to plaintiffs, on or about October 13, 2009, All Star paid a kickback of $4,230 to PRMI, "laundered" through Best Rate Referrals, a "Nevada based data and lead list provider." *Id.* ¶ 53; *see* ECF 1-2. Plaintiffs point to a sham invoice referencing Doug Adkins, a loan officer with Primary Residential (ECF 1, ¶ 53; ECF 1-2 at 1), which reflects that Best Rate Referral produced and mailed solicitations for PRMI. *Id.* ¶ 54. However, payment on the invoice was

wired by All Star, from its bank in Maryland.  ECF 1, ¶ 53; ECF 1-2 at 2.  The invoice specifically includes "first class postage" and appears to have been sent to "the states of GA & VA."  ECF 1-2 at 1.

On October 20, 2009, Direct Marketing Associates Services, Inc. ("DMA") invoiced Primary Residential, through Adkins, for a "Turnkey Direct Mail Campaign."  ECF 1-3 at 1; *see* ECF 1, ¶ 56.  The total cost was $2,950, inclusive of postage.  ECF 1-3 at 1.  The mail pieces appear to have been sent from Florida, where DMA is based, to Virginia.  *Id.*  DMA sent the invoice to Adkins and Jason Horwitz, the President of All Star.  *Id.* at 3; ECF 1-24 at 2.  Horwitz completed the credit card payment form on October 21, 2009.  ECF 1-3 at 2.

On October 27, 2009, Horwitz emailed Adkins, stating: "Ok, what we'll do is, on streamlines we'll charge a flat $1300 that will include everything.  States with higher recording will be extra (Virginia, Florida)[.]  We'll just use this for all loans so it's easy for everyone.  For conventional loans, typically we charge $1250 plus title insurance."  ECF 1-4 at 1.  Plaintiffs also included as an exhibit an email dated November 6, 2009, in which Derek Adkins, Senior Loan Analyst with PRMI, sent "5 orders" to Sarah Smith, who worked for All Star.  ECF 1-5 at 1.

According to plaintiffs, the emails demonstrate that All Star and Primary Residential "conspire[d] and agree[d] to fix prices for title and settlement services associated with Primary Residential loans referred to All Star," in furtherance of the kickback scheme.  ECF 1, ¶ 59.  And, plaintiffs allege that Primary Residential continued to assign and refer loans to All Star from its Baltimore branch until that branch closed in March 2010.  *Id.* ¶ 61.  Thereafter, All Star "pitch[ed] the kickback plan to other Primary Residential branches."  *Id.*; ECF 1-6.

In an email of October 25, 2010, for example, Dan Hart, an account executive with All Star, sent an email to Pamela Sturm at PRMI, soliciting business.  ECF 1-6 at 2.  In the email exchange, Hart asked:  "Do you do any direct Mail marketing?  If not would you want to?  We can help offset the cost."  *Id.* at 1.

On May 24, 2011, Best Rate Referrals invoiced both All Star and Primary Residential, this time at a branch in Utah, for a direct mail campaign.  ECF 1-7.  Primary Mortgage was invoiced $5,472.25.  *Id.* at 3.  All Star was invoiced $1,344, *id.* at 1, which it paid by wire.  *Id.* at 5.  Plaintiffs characterize the payment by All Star as a "kickback."  ECF 1, ¶ 62.

Hart sent an email to Horwitz on May 24, 2011, titled "June Mailer."  ECF 1-8.  Hart wrote:  "Looking to get at least 15 deals out of this."  *Id.* at 1.

On June 17, 2011, Best Rate Referrals invoiced a Primary Residential branch in Arizona in the sum of $19,281.76, for a direct mail campaign.  ECF 1-10.  In an email exchange between Hart and Horwitz on June 21, 2011, Hart stated that All Star was "paying 25% of [it]."  ECF 1-11 at 2.

Horwitz wrote to the "First Administrative Group" on June 22, 2011.  ECF 1-11 at 1.  He stated that All Star wanted to set the "unit goal" at 30 loans per campaign going forward.  *Id.* Horwitz explained All Star's $1,250 fee:  "The $1250 turns into about $1000 (maybe $950 depending on the loan amount) after the title insurance split and marketing contribution.  Then take out $150 for closer, $100 for abstract, and $50 for overnights, wires, etc. and that leaves us with $650-700."  *Id.*

Horwitz indicated on June 23, 2011, that he intended to pay some portion of the invoice of June 17, 2011 "tomorrow."  ECF 1-16 at 3.  In connection with this invoice, Joyce Steed, a branch manager in Arizona for Primary Residential (*id.* at 8), emailed Hart and stated: "We are

dropping our new mailer today, all the title orders will be opened with All-star [sic] on this new order." *Id.* at 6.

On June 23, 2011, Best Rate Referrals again invoiced Primary Residential's Utah branch, this time for $5,319.00. ECF 1-15 at 1. The invoice was for a direct mail campaign. *Id.* Best Rate Referrals emailed the invoice to both Hart and Robert Timpson, a loan officer for Primary Residential (ECF 1, ¶ 127). All Star was responsible for $1,325, and Hart wired the money. ECF 1-15 at 3. Primary Mortgage was responsible for the remainder. *Id.*

And, on June 28, 2011, Best Rate Referrals invoiced Primary Residential's Utah branch for $5,459.00, again for a direct mail campaign. ECF 1-17. Best Rate Referrals sent the invoice to both Hart and Timpson. All Star was responsible for $1,325 and PRMI was responsible for the remainder. *Id.* at 3. The following day, Hart inquired whether Horwitz had paid the invoice. *Id.*

On July 18, 2011, Hart emailed a list of loans to Timpson. ECF 1-9. The loans, in Colorado, New Mexico, and Georgia, appear to have been referred to All Star from Primary Residential. ECF 1-9.

Timpson sent an email to Hart on July 26, 2011, stating: "The average title fee's [sic] I told you I was paying the 4 months before we started with you included Texas and Georgia. Taking those states out, our average fees were $968.00 per loan. As you can see that's the majority of our volume so our fees across the board went up more than $250.00 per loan when we went with you. We need to either revisit the [$]1250.00 per loan on all states but Georgia or we need to get the Marketing % increased." ECF 1-14 at 1. Plaintiffs allege that the "$1250 fixed price Primary Residential and All Star agree[d] to [was] $250 higher than the price other title companies were charging Primary Residential borrowers for the same title and settlement

services." ECF 1, ¶ 73. Plaintiffs posit that the marketing fee and the settlement overcharge are "the minimum amount of actual damages caused Primary Residential borrowers" from the scheme between All Star and PRMI. *Id.*

Best Rate Referrals sent Primary Mortgage's Utah branch an invoice on August 8, 2011, in the sum of $1,674.32, for live transfers in Maryland, Colorado, Indiana, and Georgia. ECF 1-18. Best Rate Referrals indicated in an email to Hart that All Star would pay half of the invoice. *Id.* at 3. Hart responded that he thought Horwitz had paid. *Id.* Plaintiffs "believe, and therefore aver, that the call center Best Rate Referrals uses to source these 'live transfer' calls is not in Utah such that the 'live transfer' calls are transmitted over interstate wires. . . ." ECF 1, ¶ 86.

In addition, plaintiffs allege that All Star paid a portion of Best Rate Referral's invoice of $1,606.80 on August 30, 2011, for a direct mail campaign. ECF 1-19. Best Rate Referral appears to have sent this invoice directly to Hart. ECF 1-20 at 3. Similarly, All Star allegedly contributed to the payment of Best Rate Referral's invoice of September 6, 2011, in the sum of $1,334.69, for live transfers in Utah, Colorado, Indiana, Maryland, and New Mexico. ECF 1-21 at 1, 5. According to plaintiffs, a "month later, on October 7, 2011, All Star [paid] a $6,392.98 kickback to Primary Residential laundered through Salt Lake Mailing & Printing ("SLMP") in Utah. ECF 1, ¶ 92; ECF 1-22. Horwitz faxed the credit card form to SLMP to pay the invoice. ECF 1-22 at 3.

On October 6, 2011, Horwitz sent an email to Ashley Baumgartner at All Star, as well as Hart, indicating that the new fees would be "$1350 including recording for all files," with the exception of Virginia, which would be "$1350 plus recording" and Georgia, which would be "$1550 plus recording." ECF 1-24 at 1. According to plaintiffs, the "increase raise[d] the Settlement Fee Overcharge to $350 and the Marketing Surcharge to $250 per loan. . . ." ECF 1,

¶ 96.  Nevertheless, despite the increase in fees, Primary Residential continued to refer and assign loans to All Star.  *See* ECF 1-25.

SLMP invoiced Primary Residential for direct mail on November 4, 2011.  ECF 1-26 at 1.  The total charge was $5,315.29.  *Id.* at 2.  All Star appears to have paid a portion of this invoice via credit card.  *Id.* at 3.

Camber Marketing Group, Inc. ("Camber"), a Georgia corporation (ECF 1, ¶ 101) invoiced Primary Residential on December 21, 2011, for $6,600 for a direct mail campaign.  ECF 1-27 at 1.  In an email to the "First administrative group" on January 3, 2012, Hart indicated that All Star would be "paying this whole invoice."  ECF 1-27 at 2.   In an email of February 16, 2012, from Horwitz to Hart, Horwitz said that All Star "dropped $6600 the beginning of January and now another $7750."  ECF 1-28 at 2.  He commented that All Star "got 26 new orders from 1/25 through today [*i.e.*, 2/16/12] …"  *Id.*  However, he noted that "not all 26 of these will close….  26 orders is obviously good, but not when you spend $660 [sic] to get those 26 orders and the fees are shit."  *Id.*

Also on February 16, 2012, Hart wrote to Timpson: "We are now in the whole [sic] $14,000 for these 2 drops…."  ECF 1-29 at 1.  Timpson responded that the "agreement" was for "1 closed loan for every 1000 mailers."  *Id.*

Camber invoiced Primary Residential for $6,290.00 on July 12, 2012, for a direct mail campaign.  ECF 1-31.  The invoice was for "10,000 units" of mail.  *Id.* at 1.  Timpson appears to have sent the invoice to Hart on the same day, indicating that the entire mailer was "20k" pieces, "with 10k each."  *Id.* at 2.  Timpson stated he was "sending [his] payment today."  *Id.* Plaintiffs aver that All Star paid a kickback of $6,290 in July 2012.  ECF 1, ¶ 109.

Camber sent Primary Residential an invoice of $7,700 on December 26, 2012, for a direct mail campaign.  ECF 1-32.  Horwitz sent a credit card form to Camber on January 9, 2013, authorizing a charge of $3,850.  *Id.* at 2-3.

The following month, on February 5, 2013, All Star received an invoice from Lender Feeder, LLC ("Lender Feeder"), "a Utah based marketing services company," in the sum of $6,900.  ECF 1, ¶ 115.  It was for "Half of 20,000 records mailed for Primary Residential Mortgage."  ECF 1-33 at 1.

On January 25, 2013, Timpson and Hart discussed increasing the fees for Primary Residential.  ECF 1-34.  Hart wrote to Timpson, indicating: "Jason would consider dropping 10,000 or another for February but like you indicated he would want fees to be a [sic] higher.  He would want the fees to be $1750.00, [sic] could you work with that?"  Timpson responded: "The most I could make work is $1600 that's raising them $250.  When you consider my average fee's [sic] with other title companies are $900 that's you making an extra $700 per loan for marketing. That is HUGE!"  *Id.*

In response to "unit" projections from the direct mail campaign, Horwitz stated on February 6, 2013: "Just so we're clear, I'm not dropping $1 more until we close 25 NEW loans." ECF 1-36 at 1.

## C. Primary Mortgage's Alleged Fraudulent Concealment

Plaintiffs allege: "All Star's records indicate that Primary Residential participated in the All Star Scheme through, at least, January 2016 assigning and referring loans to All Star and All Star charging borrowers the fixed prices pursuant" to the agreements.  ECF 1, ¶ 120.  According to plaintiffs, "All Star and Primary Residential conspir[ed] to fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and

unknown Primary Residential Branches, branch managers and loan officers in furtherance" of the scheme.  *Id.* ¶ 121.  Further, plaintiffs aver that there are other kickbacks, and that other third-party marketing companies were used.  *Id.* ¶¶ 122, 123.  And, plaintiffs contend, *id.* ¶ 126:

> No title services were provided by Primary Residential, or any Primary Residential employee and/or agent, associated with the receipt and acceptance of any kickback.  The payment by All Star and the receipt and acceptance by Primary Residential of the kickbacks was made solely for the assignment and referral of Primary Residential loans to All Star.

According to plaintiffs, "Primary Residential. . . and All Star undertook affirmative acts that fraudulently concealed" the kickback scheme. ECF 1, ¶ 141.  They contend that the use of third-party marketing companies and sham invoices was intended to conceal the kickbacks.  According to plaintiffs, the sham invoices and the resulting payment records "created an ongoing false record concealing and preventing discovery of the fact that any thing of value was exchanged between Primary Residential and All Star related to the assignment and referral of Primary Residential loans . . . ."  *Id.* ¶ 144.

Further, plaintiffs allege that Primary Residential and All Star made false representations in marketing materials.  *Id.* ¶ 145.  In particular, PRMI represented to borrowers that they would "Save 30 to 40%" when they used All Star for title and settlement services, when, according to plaintiffs, All Star was charging above-market fees.  *Id.* ¶¶ 146, 147; *see* ECF 1-38 at 1.

In addition, plaintiffs contend, *id.* ¶ 150:

> As a regular and continuing business practice, Primary Residential and All Star chose to falsely allocate the charges for title and settlement services associated with a borrower's loan to only those categories of title services [the Truth in Lending Act] excludes from the APR calculation, thereby falsely minimizing the APR reported on Primary Residential borrowers' loan documents and required federal disclosures.

Among other things, plaintiffs note that "fees for title examination" and "abstract of title" are excluded from the APR calculation.  *Id.* ¶ 151.  But, settlement and closing fees, application

13

signing fees, and settlement service costs are "required to be included in the APR calculation." *Id.* Plaintiffs contend that Primary Residential and All Star "allocate[ed] the charges associated with conducting a settlement or closing. . . to the category of 'title exam' or 'abstract'" and thereby created a "false, and falsely minimized APR." *Id.*

Plaintiffs note that under the Truth in Lending Act ("TILA"), the "APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates. . . ." *Id.* ¶ 148. They point to a series of emails that allegedly show All Star's practice of manipulating the APR dates to 2011, and continuing at least through October 2015. *Id.* ¶ 152; *see* ECF 1-39; ECF 1-40; ECF 1-41. Further, plaintiffs assert that Primary Residential "participates in the same false allocation of fees and manipulation of the APR, and ratifies that false allocation of fees on loans assigned and referred to All Star. . . ." ECF 1, ¶ 153. And, plaintiffs allege that All Star uses a software program called "Titlehound" to "automatically execute these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce Primary Residential loan documents to present to borrowers and on which Primary Residential and All Star intend borrowers rely." *Id.* ¶ 156; *see* ECF 1-42. This false allocation of fees, according to plaintiffs, "fraudulently conceal[ed] from borrowers the coordinated business relationship between Primary Residential and All Star. . . ." ECF 1, ¶ 157.

Moreover, plaintiffs allege that Primary Residential made other false representations to borrowers. According to plaintiffs, PRMI fraudulently included "the Settlement Fee Overcharge … and the Marketing Surcharge..." associated with the scheme in disclosures to borrowers meant to reflect the charges for "'title services and lenders' title insurance.'" *Id.* ¶ 160; *see id.* ¶ 161. This practice, according to plaintiffs, "conceal[ed] from borrowers. . . the charges and amounts

14

associated with the surcharges and flat fixed fees. . .” as well as the “supracompetitive nature of the charges,” the “illegal kickbacks,” and the “coordinated business relationship between Primary Residential and All Star. . . .”  *Id.* ¶ 162.

And, plaintiffs contend that “Primary Residential and All Star. . . cause[d] the false allocation of fees. . . to repeat and appear on Primary Residential borrower’s HUD-1 statements ...” *Id.* ¶ 165.  Plaintiffs also allege that, as a regular business practice, PRMI “omits and fails to describe anywhere on a borrower’s HUD-1 statement the amount of the kickback received. . . .” *Id.* ¶ 166.  Similarly, plaintiffs allege that the amount of the settlement fee overcharge and the marketing surcharge do not appear on borrowers’ HUD-1 forms.  *Id.* ¶ 167.

### D.  Richard Donaldson

Donaldson’s mortgage from Primary Residential closed on October 24, 2012.  ECF 1, ¶ 127.  Timpson, at the Hildale Branch in Maryland, was the loan officer.  *Id.*  Timpson referred Donaldson’s mortgage to All Star.  *Id.* ¶ 128.  Plaintiffs contend that this referral was “quid pro quo for the kickback All Star pa[id] to Primary Residential on July 20, 2012, by and through Camber. . . .”  *Id.*  Donaldson, according to plaintiffs, was deprived “of his choice of title and settlement service provider and . . . kickback-free title and settlement services.”  *Id.*

Further, plaintiffs contend that All Star charged Donaldson “$1350 in total title and settlement service fees” and that these fees were “supracompetitive and higher than the same charge would have been,” absent the kickbacks.  *Id.* ¶ 129.  According to plaintiffs, the “title and settlement service fees included the $350 Settlement Fee Overcharge and $250 Marketing Surcharge. . . which is the minimum amount of Donaldson’s actual damages. . . .”  *Id.* ¶ 130.

According to plaintiffs, Donaldson had “no actual notice before, at or after the closing of his Primary Residential loan of the illegal kickbacks,” the relationship between PRMI and All

Star, the scheme generally, or that the prices he was charged were "supracompetitive." *Id.* ¶ 170. He reviewed his loan documents in advance of the closing, but they reflected the "false allocation of fees" as well as a "false APR." *Id.* ¶ 175. Donaldson believed the representations made in these documents. *Id.* ¶ 177. He had "no reason to believe" that there was "a coordinated business relationship. . . between Primary Residential and All Star," a kickback from All Star for the referral for title and settlement services, or a supracompetitive price. *Id.*

Donaldson reviewed all documents provided by All Star, including the HUD-1 Settlement Statement. *Id.* ¶ 179. Plaintiffs contend that "Primary Residential and All Star chose to omit from the documents Donaldson reciev[ed] at his closing, including his HUD-1, any description or statement" of a coordinated business relationship between Primary Residential and All Star" and "any description or statement of any payment. . . by All Star to Primary Residential relate to Donaldson's loan." *Id.* ¶¶ 180, 181.

On or about November 9, 2018, Donaldson was contacted by counsel concerning his loan. *Id.* ¶ 186. This was his "first indication of any potential wrongful" conduct. *Id.* He retained counsel within a week; and the Complaint was filed within months of Donaldson "becoming aware of facts giving rise to his causes of action, injuries, and actual damages." *Id.* ¶ 187. As a result of this diligence "before, during, and after the closing of his loan," plaintiffs contend that "the statute of limitations related to Donaldson's claims was tolled beginning on the date of his loan closing and continuing until Donaldson's learning of facts giving rise to his causes of action on or about November 9, 2018." *Id.* ¶ 188.

### E.  Walter and Dawn Sperl

Walter and Dawn Sperl obtained a residential mortgage from Primary Residential on or about April 23, 2015. *Id.* ¶ 134. The Sperls aver that Primary Residential assigned their loan to

All Star for title services, "depriving the Sperls of their choice of title and settlement service provider and denying the Sperls kickback-free title and settlement services." *Id.* ¶ 135. They were charged $1,631.35 in title and settlement fees. *Id.* ¶ 136. According to plaintiffs, this included $700 in marketing fees. *Id.* Plaintiffs contend the charges were "supracompetitive." *Id.* ¶ 138.

Plaintiffs contend that the "Sperls receive[d] loan documents prepared by Primary Residential in advance of their closing and review[ed] those loan documents." *Id.* ¶ 191. The Sperls aver that their loan documents omitted any description of the coordinated business relationship between Primary Residential and All Star, the payment of kickbacks, and the supracompetitive nature of the prices the Sperls paid for title and settlement services. *Id.* ¶¶ 193, 195. And, the documents contained the "false allocation of fees and a false APR. . . ." *Id.* ¶ 194.

At the loan closing, the Sperls were provided with a HUD-1 settlement statement. *Id.* ¶ 198. Plaintiffs contend that it contained no statements concerning the coordinated business relationship between Primary Residential and All Star or the kickback payments. *Id.* ¶¶ 199, 200. And, the HUD-1 contained a "false allocation of fees." *Id.* ¶ 201.

According to plaintiffs, the Sperls were first informed of the potential wrongdoing on January, 19, 2019. *Id.* ¶ 204. They retained counsel "within days" and the Complaint was filed "within weeks." *Id.* ¶ 205.

Additional facts are included, *infra*.

## II. Legal Standards

### A. Rule 12(b)(1)

Primary Residential raises a facial challenge to the Court's subject matter jurisdiction. ECF 9-1 at 5. It argues that plaintiffs lack standing to pursue their claims because they have not alleged an injury in fact. *Id.* at 6.

Under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848

F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

**B.  Rule 12(b)(6)**

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect

statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).   But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).   If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.   *Twombly*, 550 U.S. at 555.   "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678.   Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).   However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual

allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington*

*Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Plaintiff submitted 41 exhibits with the suit. Primary Residential attached plaintiff Donaldson's HUD-1 settlement statement. ECF 9-2. Because the form is referenced repeatedly in the Complaint, I may consider it, along with plaintiffs' exhibits.

### C. Rule 9(b)

Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *U.S. ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see Fessler v. Int'l Business Machines*

*Corp.*, __F.3d__, 2020 WL 2479683 (4th Cir. May 14, 2020).  In other words, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery.  *U.S. ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted)

>   Rule 9(b) serves several salutary purposes:
>
>   First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

### III. Discussion

### A.  Standing

Pursuant to Rule 12(b)(1), PRMI has moved to dismiss the suit in its entirety, on the threshold ground that plaintiffs lack Article III standing because they have not adequately alleged an injury-in-fact.  ECF 9-1 at 6.  In particular, defendant asserts that plaintiffs have not adequately alleged that the prices they paid for title settlement services were, in fact, "supracompetitive, because they fail to plausibly allege what the competitive price would have been."  *Id.* at 6-7.  In addition, PRMI contends that plaintiffs have not adequately alleged any monetary injury-in-fact, *id.* at 7, and any non-monetary injury is not concrete or particularized. *Id.* at 9.

### 1.  General principles

It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to the adjudication of "actual, ongoing cases or controversies."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'"  *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016)).

Therefore, during the pendency of a case, an actual controversy must exist.  *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013).  Conversely, in the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ."  *S.C. Coastal Conservation League v. U.S. Army Corps. of*

*Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate cases and controversies.") (internal quotation marks and citations omitted). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The "constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [] of justiciability.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted); *South Carolina*, 912 F.3d at 730. Like standing, ripeness is an issue of subject matter jurisdiction. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see NAACP v. Bureau of Census*, 382 F. Supp. 349, 363 (D. Md. 2019) (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). As discussed, *infra*, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer County Board of Ed.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167, 180 (2000)).  Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers."   *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's exercise of jurisdiction.  *United States v. Windsor*, 570 U.S. 744, 756-57 (2013); *see also*, *e.g.*, *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11; *Doe v. Sebelius*, 676 F. Supp. 2d 423, 428 (D. Md. 2009). Prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'"  *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (citation omitted).

One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'"  *Buchanan v. Consolidated Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th Cir. 1984)).

To establish Article III standing, a plaintiff must satisfy three elements.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be

likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision.

*See also Spokeo, Inc.*, 136 S. Ct. at 1548; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168

(2014); *Clapper*, 568 U.S. at 409; *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *Overbey v.*

*Mayor of Baltimore*, 930 F.3d 215, 226-27 (4th Cir. 2019); *South Carolina*, 912 F.3d at 726;

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Wikimedia Found. v.*

*Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th

Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160

(4th Cir. 2011).[3]

   "For an injury to be traceable, 'there must be a causal connection between the injury and

the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751,

760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). However, "the defendant's conduct need

not be the last link in the causal chain[.]" *Id.*; *see also Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6

("Proximate causation is not a requirement of Article III standing[.]"). "[W]here the plaintiff

suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's

conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne*

*on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197

(4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

---

   [3] As the Fourth Circuit explained in *Deal*, 911 F.3d at 189, the two concepts—actual,
ongoing injury or imminent injury—are "disjunctive." An "allegation of future injury may
suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the
harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5);
*see Lujan*, 504 U.S. at 564; *South Carolina*, 912 F. 3d at 726. In contrast, "'[a]llegations of
*possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original)
(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). This requirement serves "to ensure
that the alleged injury is not too speculative for Article III purposes." *Wikimedia Found.*, 857
F.3d at 208.

### 2. Alleged Harms

Plaintiffs assert a variety of injuries. The first is financial: plaintiffs claim that they suffered monetary damages in the form of settlement fee overcharges and marketing fees. *See, e.g.*, ECF 1, ¶¶ 129, 130. According to plaintiffs, the fees they paid to All Star were "supracompetitive" and "higher than the same charge would have been" without the scheme. *See, e.g.*, *id.* ¶¶ 129, 132.

Plaintiffs also allege a number of related injuries. They assert that they were "stripped of [their] choice of title and settlement service provider and [their] mortgage broker's impartial evaluation of All Star's service and quality[.]" *Id.* ¶ 132. Further, they claim that they were "deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers." *Id.*

### 3. Analysis

As noted, this is a putative class action. But, the Court analyzes standing "based on the allegations of personal injury made by the named plaintiff." *Dreher*, 856 F.3d at 343. As to plaintiffs' financial injury, Primary Residential argues that "they have not adequately alleged that the prices that they paid for [the title and settlement services] were, in fact, supracompetitive, because they fail to plausibly allege what the competitive price would have been." ECF 9-1 at 6-7. Specifically, Primary Residential contends that plaintiffs failed to allege the competitive price for title and settlement servicers "in the relevant geographic market and time period." *Id.* at 8.

Defendant insists that the Complaint fails to "allege what the 'competitive' price actually was, or even the comparative prices that were being charged by even one other title and settlement servicer in the relevant geographic market and time period.[]" In its view, this omission is "critical." *Id.*

PRMI's arguments are essentially threefold.  ECF 9-1 at 9 n.2.  First, defendant contends that the average fee in 2013, as discussed in ECF 1-34, the email form Timpson to Hart, "is not a plausible comparator" for plaintiffs' loans, because those were obtained in 2012 and 2015.  *Id.* And, defendant argues that an "average" is a "meaningless comparator to Donaldson and the Sperls without plausible allegations establishing that the borrowers underlying the 'average' fee. . . are similar to Plaintiffs."  *Id.*

Moreover, defendant contends that in this context an average is "mathematically deceiving" because "[a]n average fee of $900 could mean that [Timpson] previously encountered one hundred settlement charges of $100 and one hundred settlement charges of $1700— averaging $900 per settlement."  *Id.*  Further, defendant argues that plaintiffs "have not pleaded any facts to distill how this 'average' fee of $900 compared to the numerical distribution of settlement charges underlying it.   Nor have the Plaintiffs pleaded facts to demonstrate specifically what Donaldson (or the Sperls) would have been quoted for settlement charges had they used another vendor."  *Id.*

PRMI also argues that Donaldson did not actually pay $600 in additional fees.  It points to Donaldson's HUD-1 settlement statement, which indicates that Donaldson received a lender credit of $2,139.58, "which exceeds the alleged kickback or overcharge fee. . ."  Thus, PRMI claims that Donaldson "sustained no economic harm to provide standing."  *Id.* at 11; *see* ECF 9-2.

Plaintiffs counter that they have alleged the "specific fact, nature and amount of tangible monetary harm incurred" by Donaldson, *i.e.*, the $350 settlement fee overcharge and the $250 marketing surcharge, and by the Sperls, *i.e.*, the $700 marketing surcharge.  ECF 12-1 at 14. They also argue that they have alleged "multiple intangible harms caused by Primary

Residential's participation in the All Star Scheme." *Id.* In particular, plaintiffs point to their allegation that "Primary Residential was paying at least $250 lower for the same title and settlement service fees before it began accepting illegal kickbacks from All Star. . . ." *Id.* They also point to several exhibits appended to the Complaint, in which Timpson stated that All Star is "making an extra $700 per loan," *id.* at 15 (citing ECF 1-34), and that prior to working with All Star, Primary Residential's "average fees were $968.00 per loan . . .so [its] fees went up more [than] $250 per loan when we went with [All Star]." ECF 12-1 at 15 (citing ECF 1-14).

Further, plaintiffs contend that the "$600 in overcharges and surcharges charged and paid by Donaldson, and $700 in surcharges charged and paid by the Sperls. . . were not associated with any legitimate settlement service and [were] charged for [the] sole purpose of funding the illegal kickbacks." ECF 12-1 at 15. They maintain that a lender credit "is actually a tradeoff for the borrower having selected, and paid, a higher interest rate." ECF 12-1 at 16. Therefore, according to plaintiffs, it is not a credit, and does not offset the alleged kickbacks. *Id.*

The parties also discuss the case of *Baeher v. Creig Northrop Team P.C.*, 953 F.3d 244 (4th Cir. 2020). *See* ECF 9-1 at 8-9; ECF 12-1 at 15-16; ECF 19; ECF 22; ECF 25. In *Baehr*, the Fourth Circuit concluded that "the deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA." *Baehr*, 953 F.3d at 254. However, the plaintiffs in that case did not argue that they were overcharged. In fact, they argued that "'an overcharge is not necessary to have standing to bring [their] RESPA kickback claim.'" *Id.* at 253 (quoting appellants' brief) (alterations in *Baehr*). In contrast, the plaintiffs here have explicitly alleged that they were overcharged for title and settlement services as a result of the alleged kickbacks.

I am not persuaded by PRMI's arguments that plaintiffs have not sufficiently alleged a concrete injury.  At this stage of the litigation, the Court must assume the truth of the allegations in the Complaint.  Plaintiffs need not *prove* that they suffered concrete financial injuries.  Rather, they must plausibly *allege* that they did.  Plaintiffs have alleged: "As a direct and proximate result of the Kickback [agreement]. . . Donaldson [was] harmed because he [was]: (1) charged and pa[id]  more for settlement services than he would have paid without the illegal Kickback [agreement]. . . ."  ECF 1 ¶ 132.  They specifically allege that he was overcharged a "$350 Settlement Fee Overcharge and $250 Marketing Surcharge." *Id. ¶* 130.  Plaintiffs also alleged that "the Sperls were charged and paid more for the title and settlement services than they would have paid without the Kickback [agreement]. . . ." *Id.* ¶ 139.  Specifically, they assert that they were overcharged "at least $700." *Id.*  Plaintiffs also included exhibits with the suit that indicate that Primary Residential's prices increased when it began to work with All Star.  ECF 1-14; ECF 1-34.  These allegations are sufficient to plead a claim of injury-in-fact.

PRMI's argument that the reference to an average is insufficient, and that plaintiffs must at this stage show comparator evidence, is also unavailing.  Again, plaintiffs are not, at the pleading stage, required to prove their damage claims.  They are merely required to plead sufficient allegations.

As to the lender credits, the Consumer Financial Protection Bureau explains that "lender credits" are "tradeoffs" that "lower. . . closing costs in exchange for accepting a higher interest rate." *See What are (discount) points and lender credits and how do they work?*, https://www.consumerfinance.gov/ask-cfpb/what-are-discount-points-and-lender-credits-and-how-do-they-work-en-136/.  I cannot determine at this juncture that the credits reduced

Donaldson's overall cost.   Therefore, at this stage I cannot conclude that, on this basis, Donaldson did not suffer an injury.

In sum, I am satisfied that Donaldson and the Sperls have plausibly alleged concrete, financial injuries in the form of overpayments.  Therefore, they have adequately pleaded Article III standing.

### B.  RESPA

### 1.  Adequacy of the Claim

Plaintiffs contend that "Primary Residential by and through its brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a)." ECF 1, ¶ 213.  These "things of value" were payments to third-party marketing companies on behalf of PRMI, to generate business.  In return, Primary Residential allegedly referred loans that resulted from the marketing campaign to All Star for title and settlement services.

Congress enacted RESPA in order "to insure that consumers ... are provided with greater and more timely information on the nature and costs of the [mortgage loan] settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices...." 12 U.S.C. § 2601(a). Among other provisions, RESPA prohibits a person from accepting any "kickback," "fee," or "thing of value" as part of a real estate settlement service. 12 U.S.C. § 2607(a).  It states, *id.*:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

However, Section 8 of RESPA, codified at 12 U.S.C. § 2607(c), contains a safe harbor. It states, in relevant part, *id.*:

> Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed. . .

Therefore, defendant posits that "a lender may pay 'for services actually performed.'" ECF 9-1 at 12 (citing 12 C.F.R. § 1024.14(g)(1)(iv)).  PRMI observes that what plaintiffs "label as 'kickbacks' were not direct payments from All Star to PRMI."  ECF 9-1 at 12.  Rather, plaintiffs allege payments to third-party marketing companies, which were allegedly "disguised kickbacks for referrals."  *Id.*

According to defendant, plaintiffs "do not allege that All Star failed to perform services for which Plaintiffs paid."  *Id.*  Moreover, PRMI claims that plaintiffs "fail to allege the amounts paid had no reasonable relationship to the market value of the services performed."  *Id.* at 13 (citing 12 C.F.R. § 1024.14(g)(2)).  Rather, their "allegations show the marketing companies conducted marketing campaigns for the payments they received from All Star and PRMI."  *Id.* Thus, defendant contends that, based on the allegations in the suit, the payments fall squarely within the safe harbor of Section 8(c).  *Id.* at 12.

Plaintiffs respond that "entitlement to RESPA's safe harbor is an affirmative defense." ECF 12-1 at 20.  They also argue that the payments from All Star to the marketing companies were not "'co-marketing payments' but instead kickbacks in exchange for referrals" that were "funnel[ed] … through a marketing company to conceal [their] true nature…."  *Id.* at 22.  They point to payments that were "tied to a 'unit goal' of loans that All Star required Primary Residential to refer" in order to obtain "the fixed and supracompetitive prices" All Star charged for title and settlement services.   *Id.* at 21.

In *PHH v. Consumer Financial Protection Bureau*, 839 F.3d 1 (D.C. Cir. 2016), *rev'd on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) (en banc), a panel of the D.C. Circuit considered a

civil enforcement action of the Consumer Financial Protection Bureau ("CFPB").[4]  The panel, through then Judge Kavanaugh, said, *id.* at 40:

> In 1995, PHH, a mortgage lender, began participating in so-called captive reinsurance agreements. PHH would refer borrowers to certain mortgage insurers. Those mortgage insurers, in turn, would purchase mortgage reinsurance from Atrium, a wholly owned subsidiary of PHH. According to PHH, this was not a problem under Section 8 because the mortgage insurers would pay no more than reasonable market value to Atrium for the reinsurance they purchased. PHH argues that the mortgage insurers were thus paying reasonable market value for reinsurance from Atrium, as allowed by the statute's safe harbor, and were not paying anything for the referrals made by PHH, which would have been unlawful.

Of relevance here, the D.C. Circuit explained: "In plain English, Section 8(a) [of RESPA] prohibits, as relevant here, paying for a referral—for example, a mortgage insurer's paying a lender for the lender's referral of homebuying customers to that mortgage insurer."  *Id.* at 11.  As to Section 8(c)'s safe harbor, the court said, *id.* at 41:

> Section 8(c) creates a safe harbor, stating: "Nothing" in Section 8 "shall be construed as prohibiting" the "payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." *See* 12 U.S.C. § 2607(c)(2). Nothing means nothing.
>
> Section 8(a) prohibits, in this context, payment by a mortgage insurer to a lender for the lender's referral of a customer to the mortgage insurer. But Section 8(a) and 8(c) do not prohibit bona fide payments by the mortgage insurer to the lender for other services that the lender (or the lender's subsidiary or affiliate) actually provides to the mortgage insurer.
>
> How do we determine whether the mortgage insurer's payment to the lender was a bona fide payment for the reinsurance rather than a disguised payment for the lender's referral of a customer to the insurer? . . . If the payment to the lender-affiliated reinsurer is more than the reasonable market value of the reinsurance, then we may presume that the excess payment above reasonable market value was not a bona fide payment for the reinsurance but was a disguised payment for a referral. Otherwise, there is no basis to treat payment of reasonable market value for the reinsurance as a prohibited payment for the referral— assuming, of course, that the reinsurance was actually provided. In other words, in

---

[4] On rehearing en banc, the D.C. Circuit overturned the panel's holding that the CFPB was unconstitutionally structured.  But, it "reinstated" the panel's "interpretation of RESPA and its application. . . in this case."  *PHH Corp.*, 881 F.3d at 83.

the text and context of this statute, a bona fide payment means a payment of reasonable market value.[ ]

Further, the court explained that "reasonable market value" means a "payment that bears a reasonable relationship to the market value of the services performed or products provided." *Id.* at 41 n.22.  Notably, a payment that "bears a reasonable relationship to the market value of the services performed" does not violate RESPA, even if that payment was "tied" to a referral. *Id.* at 41-42.  Indeed, the court observed: "Tying arrangements are ubiquitous in the U.S. economy.  To be sure, tying arrangements are outlawed in certain circumstances, but they were not outlawed by Section 8 in the circumstances at issue here.[ ]"  And, the court added that tying arrangements "are rarely prohibited" and "can be *beneficial* to consumers … by enhancing efficiencies and lowering costs."  *Id.* at 42 n.23 (emphasis in *PHH Corp.*).

In addition, the court said, *id.* at 49 n.27:

Proving that the mortgage insurer paid more than reasonable market value—and thus made a disguised payment for the referral—is an element of the Section 8 offense that the CFPB has the burden of proving by a preponderance of the evidence. . . . The CFPB characterizes this issue as an affirmative defense. That is wrong. If there were express payments in exchange for referrals in this case, and PHH was trying to argue that the payments nonetheless were justified under some exception, that might potentially fit within the affirmative defense box. But here, there were no such express payments in exchange for referrals. It is the CFPB's burden to prove that the payments for reinsurance were more than reasonable market value and were disguised payments for referrals.

Judge Russell considered this precise issue in *Walls v. Sierra Pacific Mortgage Co., Inc.*, GLR-19-595, 2020 WL 1528626 (D. Md. Mar. 31, 2020).[5]  In that case, as here, the plaintiffs obtained mortgage services from a defendant lender, and the defendant referred title services to All Star in exchange for alleged kickbacks.  *Id.* at *1.  Further, as in this case, plaintiffs claimed

---

[5] As noted, the plaintiffs in *Walls* are represented by the same lawyers who represent the plaintiffs in this case.

that the kickbacks were "laundered through third-party marketing companies, who created 'sham invoices' or 'sham payment records' to conceal the true nature of the transactions…." *Id.*

Relying on the panel's opinion in *PHH Corp.*, Judge Russell concluded in *Walls* that plaintiffs failed to allege an element of their RESPA claim. *Id.* at *7. In his view, the plaintiffs failed to allege that the lender's payments to All Star were not protected under RESPA's safe harbor provision.

Conversely, in *Somerville*, 2019 WL 6131288, at *3, another case involving a lender and All Star, Judge Messitte determined that the complaint stated a RESPA claim, although the safe harbor issue was not presented. He noted that the suit was "chocked full of detailed allegations supported, in many instances, by invoices, forms, and emails by [the lender]." *Id.* And, in that case, the alleged kickbacks were paid in postage stamps. *Id.*

At this stage of the litigation, I am satisfied that plaintiffs have adequately pleaded facts that plausibly allege that the payments were not within the ambit of RESPA's safe harbor. Plaintiffs have alleged that the payments were not for marketing services but, instead, were kickbacks for referrals. For example, they assert, ECF 1, ¶ 24:

> To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing company to issue sham invoices falsely stating the payment is being made by All Star for the purpose of purchasing marketing services from the third party marketing company. These sham invoices create the false impression that All Star is purchasing marketing services when in fact All Star is not purchasing marketing services, and the payment is a kickback the Participating Lender is receiving and accepting in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

They also alleged that the payments were made solely for referrals, and that the payments were not for the provision of title services, *id.* ¶ 126:

> No title services were provided by Primary Residential, or any Primary Residential employee and/or agent, associated with the receipt and acceptance of

any kickback. The payment by All Star and the receipt and acceptance by Primary Residential of the kickbacks was made solely for the assignment and referral of Primary Residential loans to All Star.

Plaintiffs may not succeed on their claim.  But that is not the test.  They have plausibly alleged that the payments from All Star to the third party marketing companies do not fall within Section 8's safe harbor provision.  *See Alexander v. Washington Mut., Inc.*, 2008 WL 2600323, at \*4 (E.D. Pa. June 30, 2008) (noting that plaintiffs had sufficiently pleaded around the safe harbor provision by alleging that the "payments" were "for services not actually performed. . . .").

## 2.   Limitations

Alternatively, defendant contends that plaintiffs' RESPA claims are time-barred.  ECF 9-1 at 11.  It notes that Section 8 claims "must be brought within one year of the loan's closing date."  *Id*.; *see* 12 U.S.C. § 2614.  And, it contends that plaintiffs have not pleaded facts adequate to entitle them to equitable tolling of limitations.  ECF 9-1 at 11.

Under RESPA, a claim must be lodged within one year of the loan closing.  12 U.S.C. § 2614.  But, the doctrine of equitable tolling is available in RESPA cases.  Because Donaldson's loan closed in 2012, and the Sperls' loan closed in 2015, they must allege facts sufficient to meet the test for equitable tolling.  As the court in *Walls* stated, 2020 WL 1528626, at \*3:

> RESPA claims must be filed one year from the closing of the loan. 12 U.S.C. § 2614; *see also Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 546 (4th Cir. 2019). However, the statute of limitations is subject to tolling on equitable grounds— including fraudulent concealment. Id. at 548. The fraudulent concealment doctrine prevents defendants from taking advantage of the limitations period when they have committed "secret illegal conduct." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 125 (4th Cir. 1995).

The test for equitable tolling was articulated by the Fourth Circuit in *Marlinton*, 71 F.3d at 122.  There, the Court said, *id.*:

38

> To invoke the doctrine in this circuit, a plaintiff in an antitrust action must satisfy each element of a three part test. Specifically, a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.

More recently, in *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019), the Fourth Circuit made clear that the doctrine of equitable tolling may provide relief from RESPA's limitations period based on fraudulent concealment, if the Court's three-step test is satisfied. *Id.* at 549. The "affirmative" acts of concealment necessary to establish fraudulent concealment "may include acts of concealment involved in the [alleged] violation itself." *Id.* at 553 (alteration in original).

In *Edmonson*, a group of mortgage brokers had entered into agreements with a title services company to refer loans for title and settlement services in exchange for "unearned fees and kickbacks to induce those referrals. . . in violation of RESPA. . . ." *Id.* at 541. The alleged kickbacks were made to corporations created by a marketing and account representative of the title services company for the purpose of providing marketing and lead-generation services. *Id.* The Fourth Circuit concluded that the plaintiffs' allegations that the kickbacks had been laundered through the sham companies, that the defendants had entered into "sham" backdated title services agreements,  and that the mortgage lenders had "concealed their kickback scheme by not reporting the payments on Plaintiffs' required HUD-1 Settlement Statements. . .", constituted affirmative acts of concealment sufficient to trigger equitable tolling and to survive a motion to dismiss. *Id.* at 553-54.

Here, plaintiffs maintain that they have adequately pleaded affirmative acts of concealment on the part of Primary Residential. ECF 12-1 at 25-29. For example, plaintiffs contend that All Star and Primary Residential used "sham invoices" to conceal "kickbacks" paid

by All Star to various third-party marketing companies in exchange for client referrals from PRMI. *See, e.g.,* ECF 1, ¶ 7. And, plaintiffs allege that Primary Residential engaged in falsification of various disclosures to lenders, including the "Good Faith Estimate" and plaintiffs' HUD-1 Settlement Statements.

*Somerville*, 2019 WL 6131288, is instructive. In that case, which involved allegations of kickbacks paid by All Star through a third-party company, Judge Messitte observed that such payments "are in-of-themselves evidence of the type of trickery that amounts to fraudulent concealment." *Id.* at *2. Similarly, in *Walls* Judge Russell concluded that the plaintiffs had "sufficiently pled that [the mortgage lender] fraudulently concealed evidence of its alleged scheme," based on factual averments akin to those presented here, including alleged kickback payments that were concealed and the use of falsified documents. *Walls*, 2020 WL 1528626, at *5. As the *Walls* Court noted: "The Fourth Circuit has recognized that 'omitting required information from the HUD-1 Settlement Statement form can constitute an affirmative act of concealment for the purposes of the fraudulent concealment tolling doctrine.'" *Id.*, 2020 WL 1528626, at *4 (quoting *Edmonson*, 922 F.3d at 544).

Therefore, I conclude that plaintiffs have pleaded sufficient allegations to show acts of concealment and, in turn, to set forth a basis for equitable tolling.

As to plaintiffs' diligence, Primary Residential argues that plaintiffs "allege no diligence at all." ECF 9-1 at 17. They contend: "Showing up at a loan closing, then doing nothing until you are solicited by an attorney years later, is not reasonable diligence." *Id.*

Plaintiffs point out that they "have specifically alleged that they were not on notice of any of the facts giving rise to their RESPA claims." ECF 12-1 at 19. They allege that they exercised due diligence "before, during, and after the closings of their loans, by reviewing all pre-closing

documents, participating in the closings, reviewing HUD-1s, and, upon receiving letters from counsel describing the investigation into All Star and Primary Residential, retaining counsel within days." *Id.* at 30. Plaintiffs also assert that this is a fact issue for the jury to determine. *Id.* at 29.

Notably, a cause of action accrues when the plaintiff "has actual or constructive knowledge of his or her claim." *Parkway 1046, LLC v. U.S. Home Corp.*, ___ F.3d ___, 2020 WL 2892224, at *4 (4th Cir. June 3, 2020). Under the so-called discovery rule, accrual cannot occur until the plaintiff has, or should have, "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see also*, *e.g.*, *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010), *aff'd*, 495 F. App'x 350 (4th Cir. 2012).

In rejecting a similar argument, the *Somerville* Court noted that "it is not for the Court to determine at this stage that. . . 'one would expect a reasonable residential mortgage borrower' to conduct a further investigation into its lender's documents and fee structures." *Somerville*, 2019 WL 6131288, at *3 (quoting *Edmonson*, 922 F.3d at 558). Similarly, the *Walls* Court concluded that plaintiffs there "had no reason to investigate a potentially fraudulent relationship between [defendant] and All Star." *Walls*, 2020 WL 1528626, at *5.

Applying the same logic here, I cannot conclude, as a matter of fact or law, that plaintiffs failed to exercise due diligence. Defendant is not entitled to dismissal of the suit based on limitations.

## C. RICO

According to defendant, plaintiffs have not adequately asserted a RICO claim. ECF 9-1 at 25. In particular, PRMI asserts that plaintiffs have not adequately alleged the existence of a

RICO enterprise.  *Id.* at 26.  In addition, PRMI asserts that plaintiffs have not pleaded a pattern of racketeering activity. *Id.* at 28.  And, they assert a lack of proximate cause.  *Id.* at 32.[6]

PRMI posits that, reading the Complaint "charitably," plaintiffs have alleged an "association in fact" enterprise between All Star and various independent lenders.  ECF 9-1 at 26.  Under the alleged scheme, All Star served as the common "hub" and the various lenders were the "spokes."  *Id.*  But, defendant insists that, based on the allegations, there was no relationship between the lenders.  *Id.* at 27; *see Boyle v. United States*, 556 U.S. 938, 946 (2009); *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (per curiam).

Plaintiffs maintain that Primary Residential and All Star perpetrated the scheme "for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services related to Primary Residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property."  ECF 1, ¶ 245. The companies allegedly perpetrated this scheme through use of the mail and interstate wires, which constitute the predicate acts for the RICO claim.  *Id.* ¶ 246.  According to plaintiffs, "a bilateral enterprise between two parties of a larger 'rimless' 'hub and spoke' scheme" is sufficient to state a RICO enterprise.  ECF 12-1 at 39.

Congress enacted the Racketeer Influenced and Corrupt Organizations law as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970).  *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).  *See* 18 U.S.C. §§ 1961-1968. Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with

---

[6] PRMI also maintains that plaintiffs have failed adequately to allege an injury caused by use of racketeering income.  ECF 9-1 at 31.  But, it acknowledges that it is bound by the Fourth Circuit's decision in *Busby v. Crown Supply*, 896 F.2d 833 (4th Cir. 1990).  *See* ECF 9-1 at 31 n.17.

any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

RICO is not limited to criminal cases.  In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions."  *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'"  *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g.*, *Lewis v. Maryland*, PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014).  But, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."  *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

To plead a civil RICO claim, the plaintiff must allege "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'"  *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees.  *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005).

The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc.*, *Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). And, courts have recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "is not a cause of action to be pled lightly," and "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g.*, *Boyle*, 556 U.S. at 944; *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985). To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to have violated RICO. *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 457 (E.D. Pa. 2010); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 346-47 (D. Md. 1998).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). Moreover, a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948; *see Pinson*, 860 F.3d at 162 (stating that a RICO enterprise "need not have a rigid structure….").. However, "'[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracy*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracy*).

Notably, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946; *accord Pinson*, 860 F.3d at 161.

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. Notably, "RICO is not 'aimed at the isolated offender.'" *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added). Judge Chasanow has reiterated: "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 482 U.S. at 239).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are

not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted).  And, the enterprise's actions must affect interstate commerce.  *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

As indicated, a pattern of racketeering activity involves *continued* criminal activity.  *H.J. Inc.*, 492 U.S. at 239.  The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement.  *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996).  Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct."  *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Zepkin*, 812 F.2d at 155 ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.  The Fourth Circuit explained in *Mensaco*, 886 F.2d at 683-84:

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*.  To satisfy the continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity.  Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.  Thus, predicate acts must be part of a prolonged criminal endeavor.

(Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies. *See, e.g.*, *Lewis*, 2018 WL 1425977, at *5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at *6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

### 1.  Enterprise

As noted, PRMI argues that plaintiffs have not adequately alleged the existence of a RICO enterprise.  ECF 9-1 at 28.  It contends that plaintiffs allege an "association in fact" between All Star, Primary Residential Mortgage, as well as other independent mortgage lenders. *Id.*; *see* ECF 13 at 10-11.  This, defendant argues, is a "hub and spoke" structure, but plaintiffs do not adequately allege the "rim," *i.e.*, that the various mortgage lenders were "operating on behalf of each other and the collective enterprise."  ECF 9-1 at 28*.*  According to defendant,

plaintiffs have not alleged any facts to show that the various mortgage lenders, including Primary Residential, were linked with each other.  *Id.* at 29-30.

Plaintiffs contend that they have alleged a "bilateral enterprise" between Primary Residential and All Star, and that they are "entitled to limit their RICO claims to this bilateral enterprise."  ECF 12-1 at 39.  But, defendant argues that "an ordinary commercial relationship between two entities, wherein each acts only in its 'individual capacity' pursuing its 'independent goals' is not a RICO enterprise."  ECF 13 at 11 n.6 (quoting *Peters v. Aetna, Inc.*, 15-cv-0109-MR, 2016 WL 4547151, at *9 (W.D.N.C. Aug. 31, 2016)).  Moreover, they insist that the suit "unequivocally defines the alleged RICO enterprise as involving not only All Star and PRMI, but *also* all of the other Participating Lenders."  ECF 13 at 10-11 (citing ECF 1, ¶¶ 16-48, 244).

In *Peters*, 2016 WL 4547151, plaintiffs alleged, *inter alia*, a fraudulent scheme between Aetna, Inc., Aetna Life Insurance Company (collectively, "Aetna"), and OptumHealth Care Solutions, Inc. ("Optum"), a subcontractor, by which insureds "were caused to pay the subcontractors' administrative fees because the Defendants misrepresented such fees as medical expenses."  *Id.* at *1.  The *Peters* Court reviewed *Boyle*, 556 U.S. 938, discussed earlier.  There, as noted, the Supreme Court observed that, under RICO, "an association-in-fact enterprise must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.  And, the group must engage in a course of conduct for a common purpose. *United States v. Trukette*, 452 U.S. 576, 583 (1981).

The *Peters* Court concluded that the plaintiffs "failed to assert anything more than an ordinary commercial relationship between Aetna and Optum through which Aetna is pursuing its

own, independent goal. . . ." *Peters*, 2016 WL 4547151, at *9. The plaintiffs there did not sufficiently allege that the two companies were acting "'on behalf of the *enterprise* as opposed to' the companies 'in their individual capacities, to advance their individual self-interests.'" *Id.* (quoting *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)) (emphasis in *Walgreen Co.*).

Here, the Complaint describes in detail the so-called All Star scheme and identifies the participants: All Star, PRMI, and other "Participating Lenders." ECF 1, ¶ 16.[7] The Complaint contends that the scheme began at least in 2008, when All Star agreed "to pay kickbacks to various residential mortgage lenders. . . in exchange for [their] assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services. . . ." *Id.* ¶ 17. Further, plaintiffs allege: "One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement services than is possible in a competitive market, and to exclude other title and settlement service companies from the market. . . ." *Id.* ¶ 30. To achieve this objective, plaintiffs contend, "All Star and Participating Lenders conspire[d] to and form[ed] a cartel. . . ." *Id.* ¶ 31.

Defendant is correct that the essence of the enterprise alleged in the Complaint is inescapably one of the "hub and spoke" variety, in which the mortgage lenders (here, the spokes), comprise an association in fact with All Star (the hub). *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir.2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction.") (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)).

---

[7] Plaintiffs' RICO claim is intertwined with their now-abandoned Sherman Act claim.

Significantly, the Complaint is devoid of facts connecting the spokes. In other words, the Complaint is bereft of allegations suggesting that the participating mortgage lenders were working together in furtherance of the scheme or, indeed, that they were even aware of each other's existence. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) (noting that an asserted hub and spoke conspiracy without a rim was "fatally defective").

To be sure, plaintiffs posit that they are "masters of the Complaint" and are therefore "entitled to limit their RICO claim to [that of a] bilateral enterprise." ECF 12-1 at 40. But, to interpret the Complaint as plaintiffs urge is tantamount to rewriting the Complaint by way of an opposition to a motion to dismiss. This is not permitted. *See, e.g.*, *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (noting that "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)).

The heart of plaintiffs' RICO claim involves a structure that they have simply failed to allege. Accordingly, I conclude that plaintiffs have failed plausibly to allege a RICO enterprise.

### D. *Bristol-Myers* and Out-of-State Class Members

Primary Residential contends that, pursuant to the Supreme Court's holding in *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, ___ U.S. ___, 137 S. Ct. 1773 (2017), this Court "lacks both general and specific personal jurisdiction over [it] for the claims of out of state members of the proposed national classes. . ." ECF 9-1 at 34. Defendant urges this Court to extend the Supreme Court's holding in *Bristol-Myers* to this case. ECF 9-1 at 34.

In *Bristol-Myers*, a combination of California and non-California residents filed suit against Bristol-Myers Squibb ("BMS") in state court in California, alleging they had been injured by the drug Plavix. BMS is incorporated in Delaware and headquartered in New York.

137 S. Ct. at 1778.  The "nonresidents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California."  *Id.* at 1781.   The Court found that "the mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injures as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims."  *Id.*

However, *Bristol-Myers* "concerned the exercise of personal jurisdiction by state courts over state law claims in a mass tort action."  *Weisheit v. Rosenberg & Assocs, LLC*, JKB-17-0823, 2018 WL 1942196, at *5 (D. Md. Apr. 25, 2018).  "It is unclear what impact *Bristol-Myers* has in . . ." a case involving the exercise of personal jurisdiction "by a federal court over federal law claims in a class action."  *Id.*

Courts in this district have consistently expressed skepticism concerning extending the holding of *Bristol-Myers* to federal class actions.  *See Weisheit*, 2018 WL 1942196 (declining to find a proposed amended complaint futile under Rule 15 based on *Bristol-Myers)*; *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. CCB-18-1919, 401 F. Supp. 3d 619, 628 (D. Md. 2019) (noting that the "animating federalism concerns that drove the Court to divest California of the power to hear certain claims of out-of-state plaintiffs may apply differently in federal court where the forum tribunal and any alternative tribunal represent the same sovereign.").  And, the Seventh Circuit recently declined to extend the requirements of *Bristol-Myers* to class actions in federal court.  *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020).

In any event, "the Court need not decide at this juncture what precisely the contours of a possible class will be, or if the Court will certify a class at all."  *Weisheit*, 2018 WL 1924219, at *5.  Thus, at this time, defendant's arguments on this point are premature.

**IV. Conclusion**

For the foregoing reasons, I shall grant the Motion as to the RICO claim and deny it as to

the RESPA claim.

An Order follows.


Date:  June 12, 2020                                          _____/s/_____

Ellen Lipton Hollander
United States District Judge